**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JUSTIN K. ZUCAL, DAVID M. | ) | |
| GATENS, FRANCIS C. GATENS, | ) | NO. |
| JOHN S. KIRCHNER, EMILY M. | ) | |
| GEIGER, JULIE L. LANDIS and | ) | |
| BRANDI L. DeLONG PALMER, | ) | **JURY TRIAL DEMANDED** |
| PLAINTIFFS | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| COUNTY OF LEHIGH, PHILIP | ) | |
| ARMSTRONG, EXECUTIVE, | ) | |
| EDWARD HOZZA, JR., COUNTY | ) | |
| ADMINISTRATOR, MARC REDDING, | ) | |
| DIRECTOR OF HUMAN RESOURCES, | ) | |
| RICHARD D. MOLCHANY, | ) | |
| DIRECTOR OF GENERAL SERVICES, | ) | |
| JOHN KALYNYCH, FORMER | ) | |
| DIRECTOR OF EMERGENCY | ) | |
| SERVICES, LAURIE BAILEY, | ) | |
| FORMER DIRECTOR OF | ) | |
| EMERGENCY SERVICES and | ) | |
| CHRISTINE GEHRINGER, | ) | |
| 9-1-1 SUPERVISOR, | ) | |
| DEFENDANTS | ) | |

## COMPLAINT

## JURISDICTION AND VENUE

1.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§1331 and

1343(1), (3) and (4). This is an action for damages and/or injunctive relief authorized, arising

under and instituted under 42 U.S.C.A. 2000(e)-5(f), 28 U.S.C.A. 1343(1)(3)(4), 42 U.S.C.A.

1983, the First and Fourteenth Amendments to the Constitution of the United States. The

jurisdiction of this Court is invoked to secure protection of and to redress deprivation of rights

secured by 42 U.S.C.A.2000e *et seq* providing for injunctive and other relief against discrimination in employment.

2.     All conditions precedent to jurisdiction under 42 U.S.C.A. 2000-e5(f)(3) have occurred or been complied with.

3.     Venue is appropriate in the Eastern District of Pennsylvania. Plaintiffs reside, Defendants conduct business in the Eastern District and the causes of action arise out of events which took place in the Eastern District.

## PARTIES

4.     Plaintiff Justin K. Zucal (hereinafter "Plaintiff Zucal") is an adult individual residing at 650 North 16th Street, Allentown, Lehigh County, Pennsylvania 18102.

5.     Plaintiff David M. Gatens (hereinafter "Plaintiff David M. Gatens") is an adult individual residing at 1005 West Juniata Street, Allentown, Lehigh County, Pennsylvania 18103.

6.     Plaintiff  Francis C. Gatens, (hereinafter "Plaintiff Francis C. Gatens") is an adult individual residing at 122 Cobblestone Court, Alburtis, Lehigh County, Pennsylvania 18011.

7.     Plaintiff John S. Kirchner (hereinafter "Plaintiff Kirchner") is an adult individual residing at 53 North Railroad Street, Walnutport, Northampton County, Pennsylvania 18088.

8.     Plaintiff Emily M. Geiger (hereinafter "Plaintiff Geiger") is an adult individual residing at 4139 Unionville Street, Schnecksville, Lehigh County, Pennsylvania 18078.

9.     Plaintiff Julie L. Landis (hereinafter "Plaintiff Landis) is an adult individual residing at 8130 Pheasant Run, Fogelsville, Lehigh County, Pennsylvania 18051.

10.     Plaintiff Brandi L. DeLong Palmer (hereinafter "Plaintiff Palmer") is an adult individual residing at 529 Fireline Road, Palmerton, Carbon County, Pennsylvania 18071.

11.     Defendant County of Lehigh (hereinafter "Defendant County") is a county of the third class under the laws of the Commonwealth of Pennsylvania with its address at 17 South Seventh Street, Allentown, Lehigh County, Pennsylvania 18101.

12.     Defendant Philip Armstrong (hereinafter "Defendant Armstrong") is the elected County Executive for Lehigh County, Pennsylvania, with his address at 17 South Seventh Street, Allentown, Lehigh County, Pennsylvania 18101.

13.     Defendant Edward Hozza, Jr. (hereinafter "Defendant Hozza") is the County Administrator for Lehigh County, Pennsylvania, with his address at 17 South Seventh Street, Allentown, Lehigh County, Pennsylvania 18101.

14.     Defendant Marc Redding (hereinafter "Defendant Redding") is the Director of Human Resources for Lehigh County, Pennsylvania, with his address at 17 South Seventh Street, Allentown, Lehigh County, Pennsylvania l8l01.

15.     Defendant Richard D. Molchany (hereinafter "Defendant Molchany") is the Director of General Services for Lehigh County, Pennsylvania, with his address at 17 South Seventh Street, Allentown, Lehigh County, Pennsylvania 18101.

16.     Defendant John Kalynych (hereinafter "Defendant Kalynych") is the former Director of Emergency Service for Lehigh County, Pennsylvania, with his address at 640 West Hamilton Street, 7th Floor, Allentown, Lehigh County, Pennsylvania 18101.

17.     Defendant Laurie Bailey (hereinafter "Defendant Bailey") is the former Director of 9-1-1 Center, Lehigh County, Pennsylvania with her address at 640 West Hamilton Street, 10th

Floor, Allentown, Lehigh County, Pennsylvania l8l0l.

18.     Defendant Christine Gehringer (hereinafter "Defendant Gehringer"), at all times relevant to the within action, served as a supervisor for the Lehigh County Emergency Services Communications/9-1-1 Center, with her address at 640 West Hamilton Street, 10th Floor, Allentown, Lehigh County, Pennsylvania 18101.

### FACTS GIVING RISE TO CAUSE OF ACTION

19.     At all times relevant to the within matter, Defendant County employed over eight thousand individuals.

20.     Prior to January, 2019, Defendant County maintained an 9-1-1 Emergency Call Center located at 640 West Hamilton Street, Allentown, Lehigh County, Pennsylvania 18101.

21.     Prior to January, 2019, the City of Allentown (hereinafter "Allentown") maintained a 9-1-1 Emergency Call Center at 1304 West Fairview Street, Allentown, Lehigh County, Pennsylvania.

22.     Prior to January, 2019, Plaintiffs Zucal and David M. Gatens were employed by the City of Allentown as dispatchers in Allentown's 9-1-1 Emergency Call Center.

23.     Prior to January, 2019, Plaintiffs Francis C. Gatens, Kirchner, Geiger, Landis and Palmer  were employed as dispatchers in the Defendant County's 9-1-1 Emergency Call Center.

24.     Pursuant to statutory mandates, in January, 2019, the Allentown 9-1-1 Emergency Call Center merged with Defendant County's 9-1-1 Emergency Call Center (hereinafter "9-1-1 Center.")

25.     During the 2019 calendar year, subsequent to the merger of the City and County 9-1-1 Emergency Call Centers, each Plaintiff was present for, personally witnessed and/or

-4-

learned from co-employees of discriminatory practices, the lack of proper policies, including safety policies, the refusal of county trained dispatchers to utilize language help lines, the negligent handling of emergency calls by county trained dispatchers and other inappropriate, negligent and/or reckless acts which created safety risks and concerns to county residents and were permitted by Defendant County's elected officials, administrators, supervisory and management level employees (hereinafter "County Supervisors").

### Racism Targeted At Melissa Alvarez-Carril

26.    For approximately thirteen (13) years prior to the merger in January, 2019, Melissa Alvarez-Carril (hereinafter "Ms. Alvarez-Carril") an adult individual whose race is Hispanic/Latino and whose national original is Puerto Rican, served as an administrator/supervisor of the City's 9-1-1 Emergency Center.

27.    During the period that she served as a City 9-1-1 supervisor, Ms. Alvarez-Carril maintained an impeccable record for which she received several commendations from the Allentown Police Department for her professionalism and dedication.

28.    Ms. Alvarez-Carril further effectively assisted and/or supervised the City's 9-1-1 Emergency Call Center during emergencies, including the "13th Street gas explosion" and the "Turner Street car bombing".

29.    Ms. Alvarez-Carril's dedication to her profession and to the City residents resulted in her working twelve (12) to sixteen (16) hour days for periods of weeks and in some cases months.

30.    Subsequent to the merger in January, 2019, Ms. Alvarez-Carril became the target of racially hostile comments by Defendant County's supervisory/management level employees,

including 9-1-1 Emergency Call Center supervisors.

31.     During this period, Defendant County's supervisory/management level employees subjected Ms. Alvarez-Carril to racially hostile, false and defamatory accusations, including labeling her as an "angry" or "hostile" supervisor due to her race and national origin.

32.     During the period from January, 2019 through January, 2020, Ms. Alvarez-Carril observed countless errors and/or negligent and reckless acts from 9-1-1 dispatchers.

33.     Ms. Alvarez-Carril documented and reported each act of negligence to her supervisors, for which she received hostile and negative comments.

34.     On one occasion, a caucasian 9-1-1 dispatcher responded to an emergency call with gross negligence and recklessness, which resulted in delayed responses from the police and the Emergency Medical Services (hereinafter "EMS") and said dispatcher was unable to advise the police and EMS as to the exact location of the individual in jeopardy.

35.     As a result of the aforesaid delay caused solely by the negligence and carelessness of the dispatcher, all resuscitation attempts failed, and the individual whose life could have been saved with a proper 9-1-1 call response, died.

36.     Ms. Alvarez-Carril documented and reported the dispatcher's negligent and reckless conduct and was rebuked for doing so by Defendant County's supervisors.

37.     Another caucasian 9-1-1 supervisor, Christine Buskaritz (hereinafter "Ms. Buskaritz") falsely and intentionally advised other supervisors of Defendant County that Ms. Alvarez-Carril had failed to properly process a 9-1-1 emergency call.

38.     Upon learning of this false accusation by the supervisor, other Defendant County Supervisors, without speaking to Ms. Alvarez-Carril or conducting any investigation,

began a process to terminate Ms. Alvarez-Carril.

**Plaintiffs' Citizens' Speech - Discrimination Against Ms. Alvarez-Carril**

39.     During the 2019 calendar year, each Plaintiff personally observed the discriminatory conduct directed at Ms. Alvarez-Carril by Defendant County and its supervisory/ management level employees including the individually named Defendants herein.

40.     Each Plaintiff spoke openly against the manner in which Defendant County supervisors were treating Ms. Alvarez-Carril.

41.     Each Plaintiff complained that Ms. Alvarez-Carril was being discriminated against by the aforesaid County Supervisors due to her race, color, national origin and gender.

42.     Each Plaintiff further complained that the safety issues which were properly raised by Ms. Alvarez-Carril concerning the countless errors and negligent acts by dispatchers addressed grave safety risks to the residents of Defendant County.

43.     Upon witnessing the treatment of Ms. Alvarez-Carril by Defendant County and its supervisors, each Plaintiff repeated his or her complaint that Ms. Alvarez-Carril was the victim of discrimination due to her race, color, national origin and gender.

44.     Each Plaintiff further complained that the intentional refusal of Defendant County and its supervisors to heed Ms. Alvarez-Carril's complaints created safety risks to the residents of Defendant County.

45.     Each Plaintiff complained to County Supervisors and co-employees that the 9-1-1 Center was a racially hostile working environment which adversely affected the dispatchers' performance of their job responsibilities and created safety risks to the community.

46.     At all times relevant to the within matter, an informational "pipeline" existed

among the employees and supervisors of Defendant County.

47.     As a result of Plaintiffs' public statements and complaints, County Supervisors

initially backed off from their attempt to terminate Ms. Alvarez-Carril.

### July, 2019 - January, 2020

48.     During the period from July, 2019 through January, 2020, all 9-1-1 dispatchers

worked at the same location.

49.     During the period from July, 2019 through January, 2020, Defendants' acts of

racism and racially insensitive comments directed at Ms. Alvarez-Carril intensified and were

witnessed by each Plaintiff, including:

> A.     Administrators, supervisors and dispatchers from Defendant
> County referred to people of Latino/Hispanic descent as "you
> people."
>
> B.     County Supervisors and 9-1-1 dispatchers referred to Ms. Alvarez-
> Carril as "Maria", wherein her actual first name is Melissa.
>
> C.     County Supervisors and 9-1-1 dispatchers stated, in the presence of
> Ms. Alvarez-Carril, that "All Spanish people speak with the same
> dialect."
>
> D.     Caucasian 9-1-1 dispatchers stated openly that they "do not like
> taking calls from Spanish people" and refused to use a "language
> line" translation service to assist them in communicating with
> Spanish speaking residents.

50.     During the period from July, 2019 through January, 2020, on a regular, ongoing

and daily basis, each Plaintiff complained that the refusal of certain 9-1-1 dispatchers to use the

language line translation service forced Latino/Hispanic and other non-English speaking

residents to communicate in English or be denied emergency assistance from the 9-1-1 Center.

**Plaintiffs' Complaints - Safety Issues**

51.     During this period, on a regular, ongoing and daily basis, each Plaintiff complained that experienced 9-1-1 dispatchers, trained on every type of radio, were being improperly denied by County Supervisors the opportunity to train dispatchers with less than one (1) year experience.

52.     Each Plaintiff complained that County's supervisors had allowed employees with less than one (1) year experience to train new hires with less than one (1) year experience, in violation of County policies, thereby creating safety issues concerning the proper handling of 9-1-1 emergency calls.

**Plaintiff Zucal's Citizens' Speech - Safety Matters - Public Concern**

53.     On a regular and daily basis during the period from July, 2019 through January, 2020, Plaintiff Zucal engaged in ongoing discussions with members of the police department for the City of Allentown concerning community safety issues and public concerns relating to the 9-1-1 Center.

54.     During the period from July, 2019 through January, 2020, Plaintiff Zucal spoke with police officers concerning community safety risks directly resulting from the lack of proper policies, lack of safety policies, lack of proper training of 9-1-1 dispatchers and the negligent management of the 9-1-1 Center by Defendant County Supervisors.

55.     During the period from July, 2019 through January, 2020, Plaintiff Zucal spoke on a regular basis with Allentown Police Sergeant Steven Milkovits and Allentown police officers Thomas Cunningham, III, Adam Sinton, Christopher Matthews, Anthony Cruz, Theodore Kiskeravage and Ryan Lischke concerning the aforesaid safety issues and public

concerns.

56.     As a result of his discussions with the members of the Allentown Police

Department, Plaintiff Zucal complained to County Supervisors, Plaintiffs and other co-employees

that the city's digital radio system was not a fully functioning system.

57.     Plaintiff Zucal further complained:

> A.     that the city's digital radio system was malfunctioning to the extent
> that transmission calls appeared to have been received at the 9-1-1
> Center when, in fact, said calls were not being received, leading to
> the danger of missed radio transmissions;
>
> B.     that numerous police traffic stops and pursuit transmissions were
> not being received at the 9-1-1 Center;
>
> C.     that the radio recording system was not functioning at times and
> that most times did not properly display a radio identifier of who
> was placing the emergency transmissions;
>
> D.     that safety hazards and risks to police officers and other field
> personnel whose attempts to call for radio help were being gargled
> or unreadable due to the malfunctioning of the radio identifier;
>
> E.     that the malfunctioning system wherein the dispatchers could not
> properly identify what officer was calling for assistance or render
> proper assistance to the officer initiating the transmission had
> created safety risks for the police;
>
> F.     that the dispatching delays in the city radio system slowed
> responses to calls for assistance and adversely affected police
> officers and community residents who were involved in life
> threatening situations; and
>
> G.     that the refusal of County Supervisors to allow Allentown police
> officers to have their own key fob access to the center in the event
> of an emergency, including instances wherein individuals
> possessing guns were located within the 9-1-1 Center building.

58.     County Supervisors advised Plaintiff Zucal that they feared allowing Allentown

Police officers to have key fob access to the 9-1-1 Center would turn the 9-1-1 Center into an "Allentown Police Social Club".

59.     Plaintiff Zucal further complained that the reasons given by County Supervisors for denying police officers their own key fob was ridiculous and created safety risks preventing police from assisting in emergency calls and/or resulting in instances where emergency calls relating to the 9-1-1 Center building would go unanswered.

60.     Plaintiff Zucal further complained to County Supervisors that:

> A.     Defendant County's 9-1-1 Center supervisors were forbidding Computer Aided Dispatch (CAD) messaging to be received by police officers; and

> B.     that safety risks had resulted from County Supervisors' precluding police officers from CAD messaging and the main communication system being tied up with low level, non-emergency transmissions that were non-status giving.

61.     Plaintiff Zucal further asserted that, by allowing the police access to CAD messaging, the main communication system could remain open for emergency/life-threatening situational calls.

**<u>Fire Related Safety Concerns</u>**

62.     During the 2019 - 2020 calendar years, Plaintiff Zucal served as a member of the Woodlawn Fire Department, 1651 Whitehall Avenue, Allentown,  Lehigh County, Pennsylvania.

63.     During the period from July, 2019 through January, 2020, Plaintiff Zucal spoke with firefighters from the Woodlawn Fire Department and the City of Allentown concerning community safety risks directly resulting from the lack of proper policies, lack of safety policies and negligent management of Defendant County 9-1-1 Center by County Supervisors.

64.     During the period from July, 2019 through January, 2020, the firefighters with whom Plaintiff Zucal spoke included Woodlawn Fire Chief Barry Search, Assistant Chief Richard Tice, Assistant Chief Christopher Mariner, Captain Jonathan Carl, Captain Adam Cramsey, firefighters Joseph Cincilla, Jacob Fetteroff, Sr., Jacob Fetteroff, Jr. and James Kish.

65.     During this period, Plaintiff Zucal further spoke with former Woodlawn Fire Chief and former Allentown fire captain James Kutz, Jr., former Woodlawn captain and current Allentown firefighter Jonathan Steed and former Woodlawn firefighters Ray Decker (Lieutenant), Jacob Sommers (Lieutenant), Orey Ortiz, (firefighter), Jose Fernandez (firefighter) and Andrew Sommers (firefighter).

66.     During the period from July, 2019 through January, 2020, Plaintiff Zucal complained to County Supervisors that the Fire/EMS initial dispatch verbiage was excessive in length, in some instances took more than a minute to fully transmit, created delays in units on the radio being answered and instances where calls were completely unanswered.

67.     During this period, Plaintiff Zucal complained that, due to a lack of proper safety policies, training and supervision, the 9-1-1 fire ground channels utilized to communicate during a "working fire" once established, were not being monitored by any 9-1-1 dispatchers.

68.     Plaintiff Zucal, on a daily basis, complained to County Supervisors:

> A.     that the lack of proper monitoring created safety risks in those circumstances where fire crews had difficulties hearing transmissions in a fire location due to excessive noise thereby creating the risk of missed safety messages or important transmissions going unheard by the incident commanders;
>
> B.     that the aforesaid safety risk could be completely eliminated by having 9-1-1 dispatchers monitor fire ground channels;

-12-

C.     that county 9-1-1 fire and EMS dispatchers were minutes behind police dispatchers and that dwelling fire calls for fire department assistance also involved calls for police assistance;

D.     that due to the lack of proper policies, including safety related policies, there were instances wherein county 9-1-1 dispatchers were dispatching fire related assistance calls to the police **prior** to calls being made to fire or EMS services;

E.     that, in some instances, calls for fire related assistance involving dwelling fires were being made to fire and EMS services as much as four minutes after calls for police assistance; and

F.     that safety risks had resulted due to the County's lack of safety policies and improper staffing of the 9-1-1 Center, wherein 9-1-1 dispatchers were forced to assume the responsibility of being the primary call taker on fire/EMS calls and responsible for monitoring and dispatching calls on four (4) different frequencies.

69.    Defendant Kalynych, upon being named director, met with all County Supervisors, acting supervisors and management level personnel to discuss the above-stated complaints.

70.    Defendant Kalynych and the County Supervisors refused to respond to Plaintiffs' above-described complaints and as a result, the problems and safety risks to the community and to police, fire and EMS personnel remained ongoing.

**Lack of Proper Policies/Supervision - Defendant County**

71.    During the period from July, 2019 to January, 2020, Plaintiff Zucal on a regular, daily  basis, complained about the lack of proper policies, safety policies and lack of supervision by Defendant County's lack of supervision at the 9-1-1 Center.

72.    During this period, Plaintiff Zucal further complained:

A.     that Defendant Gehringer, a supervisor, spent time watching soap operas or other programs on her personal computer when she

should have been overseeing and managing the safety related operations of the 9-1-1 Center;

B.      that Defendant Gehringer utilized her work time at the 9-1-1 Center to sell nail polish and other products related to her private business affairs;

C.      that Defendant Gehringer and other 9-1-1 supervisors and dispatchers were using personal devices and engaging in non-work related activities during work periods and at times when they should have been supervising and/or engaging solely in their safety related responsibilities at the 9-1-1 Center;

D.      that the community was being subjected to safety risks by 9-1-1 dispatchers who violated their individual job responsibilities;

E.      that he witnessed a 9-1-1 dispatcher named Michael Nester (hereinafter "Mr. Nester") set up his personal computer to watch movies and fall asleep during the work related period wherein he was responsible for monitoring radio channels and 9-1-1 emergency calls;

F.      that, on one occasion, Mr. Nester's trainee also fell asleep while training and spent inappropriate periods of time on her personal I-Phone during work hours;

G.      that Mr. Nester's sleeping while on the job resulted in countless calls going unanswered or sent to other dispatchers in instances involving life-threatening emergencies;

H.      that as a result of County Supervisors' refusal to discipline Mr. Nester for watching movies and sleeping while on the job, several calls involving life-threatening emergencies were unnecessarily delayed and/or went unanswered;

I.      that Mr. Nester's inappropriate and violative conduct was allowed to continue on a daily basis;

J.      that certain dispatchers were using personal devices which interfered with the performance of their job responsibilities;

K.      that 9-1-1 trainees were using phones and social media while working and being distracted from their training;

-14-

L.     that 9-1-1 trainees were permitted to play personal electronic devices in such a loud manner as to distract or interfere with their job responsibilities, including playing movies in a sound loud enough to drown out radio transmissions or cause other dispatchers to miss emergency calls;

M.     that certain 9-1-1 dispatchers, due to lack of training and/or poor attitude, refused to answer emergency phone calls in a timely fashion and allowed the phones to ring multiple times until answered by another dispatcher; and

N.     that the lack of proper policies, safety policies and refusal by County Supervisors to properly discipline certain 9-1-1 dispatchers, had resulted in long wait times for phone calls to be answered and unacceptable dispatch delays on calls for emergency assistance.

**Computer Aided Dispatch (CAD) System**

73.    During the period from July, 2019 through January, 2020, Plaintiff Zucal spoke with County Supervisors about safety risks created by certain dispatchers' placing improper emergency call narrative documentation into the computer aided dispatch (CAD) system.

74.    Plaintiff Zucal complained:

A.      that certain 9-1-1 dispatchers were improperly receiving and processing calls which were to be dispatched over the radio to police, fire, or EMS responders;

B.     that due to the lack of proper policies, safety policies and supervision, certain dispatchers failed to process emergency call updates to be transmitted by the sending dispatcher to the police, fire and EMS responders; and

C.     that the dispatchers' negligence in failing to properly receive and dispatch calls pursuant to the CAD system created safety risks to the police, fire and EMS responders who were unable to receive verbal updates and forced to direct their attention to visual updates while traveling to the scene of the emergency.

**License Plates - Emergency Calls**

75.     During the period from July, 2019 through January, 2020, on a regular, daily

basis, Plaintiff Zucal complained to County Supervisors:

> A.     that, due to a lack of policies, safety policies, supervision and
> discipline, certain 9-1-1 dispatchers were refusing to properly
> search license plates involved in emergency calls in order to
> determine whether an emergency call involved potential criminal
> activity; and
>
> B.     that the failure of County Supervisors to implement proper policies
> relating to the 9-1-1 dispatchers' "running" license plates to
> determine potential criminal activity during several 9-1-1 calls had
> subjected police, fire and EMS responders to unnecessary danger
> and risks of harm.

76.     Plaintiff Zucal complained that on one 9-1-1 emergency call, as a direct result of

the 9-1-1 dispatcher's refusal to properly "run" a license plate, a police officer unknowingly had

responded to an emergency call that was criminal in nature and involved a stolen vehicle.

77.     In response to Plaintiff Zucal's complaints, Defendants Kalynych, Bailey and

other County Supervisors stated that it was not the dispatchers' responsibility to properly "run"

license plates regardless of whether their failure to do so placed police, fire and EMS responders

in greater danger or risk of harm.

**Allentown Police, Fire, Woodlawn Fire Company Complaints - Dispatch Delays**

78.     Plaintiff Zucal, on a regular and daily basis, received complaints from members

of the Allentown Police and Fire Departments and the Woodlawn Fire Company concerning

unnecessary delays in the dispatch of emergency calls over the CAD system.

79.     As a result, Plaintiff Zucal complained to County Supervisors:

> A.     that, due to a lack of proper training, supervision and discipline

certain 9-1-1 dispatchers were not verifying municipalities from which emergency calls had emanated and were failing to ask specific responder safety related questions, such as whether there were weapons involved at the scene of the incidents;

B.      that the aforesaid delays resulted from dispatchers negligent failure to mark calls "ready for dispatch" calls which would them on a "pending" screen marked ready for dispatch;

C.      that as a result of the dispatchers' negligent failure to properly process "ready for dispatch" calls, certain fire and EMS related emergency calls were delayed more than forty-five minutes before being forwarded for dispatch; and

D.      that the lack of proper policies, safety policies, supervision and discipline concerning 9-1-1 dispatchers improper use of the CAD System had created unnecessary delays in response and safety risks to those residents involved in calls for emergency services.

### Defendant Kalynych - "corn hole" Board

80.     On October 1, 2019, Defendant Kalynych posted on his FaceBook profile page a picture of a "corn hole" board containing the 9-1-1 Center and Lehigh County EMA logo. A photograph of the "corn hole" board is attached hereto, marked Exhibit "A" and incorporated herein.

81.     Defendant Kalynych's FaceBook profile page further contains the words "a new addition to the break room/PR events attraction."

82.     In response to Defendant Kalynych's Facebook profile a CAD administrator wrote "I saw one on the 7th floor and the other on the 10th. Elevator shaft corn hole anyone? A copy of the FaceBook comments are attached hereto, marked Exhibit "B" and incorporated herein.

83.     During the period from October, 2019 through January, 2020, Plaintiff Zucal, on a daily basis complained to Defendant Kalynych and other County Supervisors:

A.   that the placement of the "corn hole" board on county property had resulted in an unnecessary distraction to several 9-1-1 dispatchers and further resulted in said dispatchers leaving their positions during work hours to play on the "corn hole" boards;

B.   that as a result of Defendant Kalynych's irresponsible, reckless and negligent placement of "corn hole" boards on county property, 9-1-1 dispatchers were encouraged to leave their work positions during working hours in order to play on the "corn hole" boards; and

C.   that the 9-1-1 dispatchers' playing on the "corn hole boards" during working hours had resulted in delays and missed emergency calls, including police calls, fire calls and calls involving life-threatening situations.

84.   Plaintiff Zucal learned of the facts comprising his above-described complaints pursuant to his employment as a 9-1-1 dispatcher, however, said complaints were not made pursuant to his personal job responsibilities and were made as a private citizen involving risks to public safety and safety related concerns resulting from Defendants' negligent and reckless operation of the 9-1-1 Center.

**Plaintiff Francis C. Gatens Protected Citizen's Speech**

85.   During the period from July, 2019 through January, 2020, Plaintiff Francis C. Gatens regularly spoke with Slatington Police Sergeant Deron Dorward, Officer William Borst, Officer Chris D-Andra, Salisbury Police Officer Jason Harrison, South Whitehall Police Sergeant Eric Kleintop and Sergeant Kevin Smith concerning multiple safety issues regarding the lack of proper training for the County's 9-1-1 dispatchers, and delays in dispatches and poor radio reception in certain parts of Lehigh County.

86.   During this period, on an ongoing and daily basis, Plaintiff Francis C. Gatens complained to County Supervisors about problems with the CAD system, including the override

of addresses and the automatic changing of municipalities which, on numerous occasions

resulted in excessive delays in properly responding to emergency calls.

87.     Plaintiff Francis C. Gatens further complained:

A.     about the problems with the digital radio system and the safety hazzards created for  police officers, fire and emergency personnel;

B.     that the majority of 9-1-1 dispatchers, due to their lack of proper training, were not properly identifying the individuals who were originating emergency calls;

C.     about the fire and emergency service risks created by delayed dispatches and dispatches being made to the wrong fire stations;

D.     that on one occasion, units in Hanover Township had requested a dispatch and rescue, however, a 9-1-1 dispatcher, through lack of training, dispatched the wrong fire station which did not contain a rescue truck;

E.     that a 9-1-1 dispatcher, due to a lack of proper training attempted to dispatch a rescue unit from the Borough of Macungie to Airport Road in Hanover Township, Pennsylvania;

F.     that he had received multiple complaints from members of fire and emergency service departments about County 9-1-1dispatchers' failing to pay attention to who was calling for assistance and failing to respond to emergency calls on a timely fashion;

G.     that the EMS/fire dispatcher and primary call taker for the 9-1-1 Center was limited to one person with no support or backup which effected and created great safety risks when multiple fires occurred necessitating multiple open channels of communication;

H.     that certain dispatchers were using personal devices which interfered with the performance of their job responsibilities;

I.     that dispatchers were failing to answer their phones or to monitor the radio communications;

J.     that trainees were using phones and social media while working causing them to be distracted from their training;

K.      that dispatchers setting up their own personal computers/electronic devices before logging into the CAD phone system; and

L.      that dispatchers and trainees were allowing personal electronic devices to be played so loud as to distract or interfere with their job responsibilities and were playing movies in a sound loud enough to drown out radio transmissions or cause other dispatchers to miss an emergency call.

88.     Plaintiff Francis C. Gatens also witnessed and complained to County Supervisors about Mr. Nester's falling asleep on the job, missing calls on the radio or phone and playing movies on his personal device in a loud and distracting manner and that Mr. Nester's trainee also fell asleep while training and spent inappropriate periods of time on her personal I-Phone during work hours.

89.     Plaintiff Francis C. Gatens further complained to County Supervisors that certain 9-1-1 dispatchers, due to lack of training or proper supervision, were not properly "running" license plates or asking enough questions about the use of weapons in order to insure the safety of the responders.

**Plaintiff Kirchner's Speech - Public Concern - Fire Chiefs, EMS and Police**

90.     During the calendar year 2019, Plaintiff Kirchner was involved with various discussions involving community safety issues with the Lehigh County Fire Chiefs' Association, EMS dispatchers and numerous police officers.

91.     During the period from July, 2019 to January, 2020, as a result of the above-described safety related discussions, Plaintiff Kirchner, on a regular and daily basis, complained to County Supervisors:

A.      that none of the four County Fire Ground channels were being placed in dispatch positions or recorded;

-20-

        B.       that the 9-1-1 Center was using a mobile radio with an antenna in order to receive fire ground channel calls and that said calls were not recorded and that the radio was not being monitored by dispatchers; and

        C.       that utilization of the mobile radio was an inadequate means to monitor radio reception throughout Defendant County.

92.     In order to prove his point to County Supervisors, during a dwelling fire call in Emmaus, Pennsylvania, Plaintiff Kirchner personally took possession of the mobile radio in order to monitor any fire related transmission or call for help.

93.     During the Emmaus dwelling fire, Plaintiff Kirchner heard a "mayday" transmission from the dwelling, alerted the incident commander and dispatched personnel to rescue firefighters trapped inside the dwelling.

94.     Plaintiff Kirchner further complained:

        A.       that, due to the County's inadequate safety policies, had he not seized possession of the mobile radio, the trapped firefighters' "mayday" call for help would have gone unanswered;

        B.       that 9-1-1 dispatchers and backup dispatchers were failing to respond to emergency calls and emergency radio transmissions because they were utilizing the phone system for non-emergency and/or personal calls;

        C.       that 9-1-1 dispatchers were ignoring or breaching their job related, safety responsibilities by playing video games on their laptop computers, watching movies on their laptop computers, conducting personal business during work time and/or sleeping and failing to respond to emergency calls;

        D.       that the aforesaid conduct of certain 9-1-1 dispatchers had caused dispatch delays and delayed response times during high priority emergencies; and

        E.       that due to the lack of proper policies, safety policies, supervision and discipline by County Supervisors, certain 9-1-1 dispatchers

continued to violate their job responsibilities and create safety risks for county residents and police, fire and EMS emergency responders.

**Plaintiff Geiger's Citizen's Speech**

95.     During the period from July, 2019 through January, 2020, Plaintiff Geiger spoke on a regular basis with Slatington Police Officer William Borst regarding multiple community safety issues and police safety issues resulting from the lack of proper training for 9-1-1 Center dispatchers, the unacceptable delays in dispatches and the poor radio reception in the northern part of Defendant County.

96.     On an ongoing basis, Plaintiff Geiger spoke with Andrew Glass, a paramedic with the Northampton Regional Emergency Medical Services and a volunteer firefighter with the Greenawalds Fire Department concerning fire and emergency services related risks resulting from unnecessary dispatch delays

97.     Plaintiff Geiger, on a regular, ongoing and daily basis, complained to County Supervisors about the digital radio system and the resulting safety risks to police officers.

98.     During this period, Plaintiff Geiger further complained:

A.     that the 9-1-1 Center had missing or unreadable transmissions from the City of Allentown, whereby improperly trained 9-1-1 dispatchers were negligent in the manner in which they identified themselves and failed to ascertain the identities of the individuals making calls for emergency assistance;

B.     that an incident occurred wherein Hanover Township Station No. 33 had requested rescue assistance and the 9-1-1 dispatcher forwarded the call to Lehigh County Station No.15, which did not have a rescue truck and was located in the Borough of Macungie;

C.     that she had received multiple complaints from various fire and emergency service departments about 9-1-1 dispatchers

continuously failing to pay attention to the identity of the individual calling for assistance;

D.  that certain 9-1-1 dispatchers, due to lack of training and/or poor attitude, refused to answer emergency phone calls in a timely fashion and allowed the phones to ring multiple times till answered by another dispatcher;

E.  that, the lack of proper policies, safety policies and discipline by County Supervisors over certain 9-1-1 dispatchers, had resulted in long wait times for phone calls to be answered and unacceptable dispatch delays;

F.  that, pursuant to the directive of County Supervisors, the 9-1-1 EMS/Fire dispatcher and primary call taker was usually one person with limited or no backup during instances where the 9-1-1 Center received multiple fire calls on multiple channels and had to respond to additional emergency service calls;

G.  that due to a lack of proper training, supervision and discipline, certain 9-1-1 dispatchers were using personal devices, phones, engaging in social media matters, listening to radios and engaging in unacceptable conduct which interfered with their answering emergency calls and the proper performance of their job responsibilities;

H.  that probationary trainees were using phones and engaging in social media activities while working at the 9-1-1 Center, even though use of phones, personal devices and engaging in social media activities were strictly prohibited to all trainees.

99.  Plaintiff Geiger further complained to County Supervisors that she had personally witnessed Mr. Nester's falling asleep while on the job, playing movies in a volume loud enough to interfere with the radio or phone transmissions and allowing a new trainee under his supervision to sleep during work hours and to use her phone device during work hours.

## CAD System

100.  During the period from July, 2019 through January, 2020, on an ongoing and

regular basis, Plaintiff Geiger complained to County Supervisors about  issues with the CAD

System which would override addresses and change municipalities and which, when not detected

by properly trained dispatchers resulted in unnecessary long response times and delays in

responding to emergency calls.

101.    Plaintiff Geiger further complained that, due to a lack of proper training,

supervision and discipline, certain 9-1-1 dispatchers were not verifying municipalities from

which emergency calls had emanated and were failing to ask specific responder safety related

questions, such as whether there were weapons involved at the scene of the incidents.

### Citizen Speech- Plaintiff Palmer

102.    During the period from July, 2019 through January, 2020, on two occasions,

Plaintiff Palmer complained to County Supervisors that the 9-1-1 phone system had crashed

while she was mid-conversation with an emergency caller.

103.    Plaintiff Palmer further complained to County Supervisors:

> A.    that the County's new phone system presented liability issues and
> safety risks to emergency callers when the system drops;
>
> B.    that once the phone system dropped an unnecessary delay resulted
> until such time as the system could be restarted, which required
> assigning an additional dispatcher to answer calls;
>
> C.    that the new phone system had phones that did not ring and only
> lit up when receiving an emergency call; and
>
> D.    that County Supervisors had negligently arranged for the phones to
> ring based on a specific log in status whereby the call taker dealt
> with police, fire and EMS related calls.

104.    Under this system, dispatchers would be assigned as a call taker for an agency, i.e.

fire, police, EMS thereby necessitating all phone calls to go to one specific dispatcher who

logged in as the call taker for each agency.

105.    Plaintiff Palmer complained that this system negligently caused an overload of

calls for fire, police and EMS dispatchers which resulted in unnecessary delays in responding to

emergency calls.

106.    During the period from July, 2019 through January, 2020, Plaintiff Palmer further

complained to County Supervisors:

A.    about the lack of supervision at the 9-1-1 Center;

B.    that an individual named Shawn Trone took up to
two hours to sign in to his CAD system, during which time he did
not have the use of his headphones and could not respond to
emergency calls;

C.    that she had witnessed Defendant Gehringer use her personal
laptop to watch movies, fall asleep during working hours and bring
her private work into the dispatch center, all of which prevented
her from properly performing her duties as a supervisor;

D.    that due to the lack of supervision, certain 9-1-1 dispatchers would
be away from their designated workplace and engaging in activities
thereby neglecting to answer their phones/radio transmissions
seeking emergency relief;

E.    that, due to a lack of supervision, certain 9-1-1 dispatchers would
prematurely sign off work before the new shift arrived, thereby
leaving their phones and radio systems unattended to receive
emergency calls; and

F.    that there existed inherent safety related problems with the radio
systems and flaws in the CAD system causing calls to disappear
from the screen and resulting in delays of more than an hour for
dispatchers to respond to calls for emergency assistance.

**Citizen's Speech - Plaintiff Landis**

107.    During the period from July, 2019 through January, 2020, Plaintiff Landis

complained to County Supervisors that, due to a lack of supervision, there had been an

emergency call involving a domestic incident where a gun was involved, however, the existence

of the gun was not documented in the call nor that a female actor had fled the scene.

108.    Plaintiff Landis advised that the female actor was involved in an automobile

accident and police were dispatched to the accident scene without being advised that the female

actor was armed.

109.    Plaintiff Landis further complained:

> A.    about difficulties and delays in processing 9-1-1 emergency calls
> from Spanish speaking citizens;
>
> B.    Due to a lack of training, certain 9-1-1 dispatchers did not
> understand basic NCIC codes which were placed into the CAD
> system;
>
> C.    that Defendant Bailey had fostered an extremely divisive
> atmosphere within the 9-1-1 Center;

110.    During this period Plaintiff Landis repeated and joined in the above-described

complaints to County Supervisors made by Plaintiffs Zucal, Francis C. Gatens, Geiger, Palmer

and Kirchner and she advised Plaintiff David M. Gatens of each complaint.

## Lack of Supervision

111.    In addition to making the above-described specific complaints to County

Supervisors and other County employees each Plaintiff spoke openly with each other and with

Plaintiffs David M. Gatens and Kirchner, in their capacity as supervisors about the following:

> A.    about Defendant County's lack of supervision and negligent
> operation of the 9-1-1 Center;
>
> B.    the lack of proper safety policies, procedures and training of
> the 9-1-1 dispatchers;

C.     the discriminatory attitude displayed against Ms. Alvarez-Carril and others of Latino or Hispanic descent;

D.     Plaintiffs' conversations with members of the public, including members of police, fire and EMS services wherein they received complaints about the negligent manner in which the 9-1-1 Emergency Call Center was operating;

E.     the lack of a fully functioning digital radio system wherein emergency calls were not being properly received or addressed by 9-1-1 dispatchers;

F.     malfunctioning radio identifiers;

G.     the County Supervisors' refusal to allow Allentown Police to have their own access to Emergency Call Center during instances where individuals possessing guns were located within the Center;

H.     the supervisors' forbidding CAD messaging to be received by police officers; and

I.     the failure of 9-1-1 dispatchers to properly monitor "working fire calls."

### Complaints - Defendants Bailey, Gehringer

112.    During the period from July, 2019 through January, 2020, in addition to making complaints to County Supervisors, each Plaintiff spoke openly with each other, other employees and Plaintiffs David M. Gatens and Kirchner in their capacity as supervisors about the inappropriate conduct of Defendants Bailey and Gehringer, including:

A.     that Defendant Bailey, as Director of the 9-1-1 Center, was negligent in her supervision of her employees;

B.     that Defendant Bailey had ignored Plaintiffs' complaints about the lack of proper policies, safety policies, supervision and discipline over certain 9-1-1 dispatchers;

C.     that Defendant Bailey had been derelict in her supervisory responsibilities and instead, had concentrated her efforts on her

private business of making and selling gift baskets;

D.      that Defendant Bailey's concentrating on her private
business during work hours and ignoring her supervisory
responsibilities had resulted in dangerous delays and problems in
the receiving and dispatching of emergency calls made to the 9-1-1
Emergency Center;

E.      that Defendant Gehringer had abrogated her supervisory
responsibilities and concentrating on her private business interests,
thereby allowing certain 9-1-1 dispatchers to engage in negligent or
reckless conduct which resulted in safety risks to county residents,
police, fire and EMS responders;

F.      that Defendant Gehringer's failure to properly supervise the 9-1-1
Center, enforce safety related mandates and failure to impart
discipline upon certain 9-1-1 dispatchers had resulted in dangerous
delays in receiving and responding to emergency 9-1-1 calls; and

G.      that the conduct of Defendants Gehringer and Bailey in prioritizing
their private business and personal needs ahead of their work
responsibilities had created safety issues, concerns and risks to
county residents, police, fire and EMS responders.

113.    Defendants Gehringer and Bailey were aware of and infuriated by Plaintiffs'

above-described complaints.

### Citizen's Speech - Plaintiff David M. Gatens

114.    In his capacity as a supervisor in the 9-1-1 Center, Plaintiff David M. Gatens was

aware of and received the above-described complaints from Plaintiffs Zucal, Kirchner, Francis C.

Gatens, Geiger, Palmer and Landis.

115.    As a supervisor, in addition to receiving the aforesaid complaints from the other

Plaintiffs, Plaintiff David M. Gatens, personally witnessed and received the above-described,

inappropriate conduct of Defendants Bailey and Gehringer.

116.    During the period from July, 2019 through January, 2020, Plaintiff David M.

Gatens conveyed Plaintiffs' above-described complaints to Defendants Kalynych, Bailey, Training Coordinator Donald Smith, Jr., Dan Bellsfield, and other County Supervisors.

### **"Town Hall" Meeting-August 26, 2019**

117.    On August 26, 2019, a "town hall" meeting took place between all County Supervisors, Administration and the above-named Defendants.

118.    During the initial Town Hall meeting, Plaintiff David M. Gatens advised the County Supervisors and all in attendance of the Plaintiffs' above-described specific complaints and his personal complaints which mirrored those of Plaintiffs.

119.    Subsequent to said meeting, Plaintiff David M. Gatens documented several 9-1-1 dispatchers for sleeping on the job and placed his report in the Guardian Tracking System, an in-house disciplinary system for the 9-1-1 Center.

120.    During the period from August 26, 2019 through December 10, 2019, Plaintiff David M. Gatens repeated his complaints as well as those of Plaintiffs Zucal, Francis C. Gatens, Kirchner, Geiger, Landis and Palmer to County Supervisors concerning safety issues, lack of proper safety policies, supervision and discipline at the 9-1-1 Center had resulted in safety risks to the public, police, fire and EMS responders.

121.    During the period from August 26, 2019 through December 10, 2019, County Supervisors neglected, ignored and refused to respond to any of the Plaintiffs' above complaints nor did they respond to the specific complaints made by Plaintiff David M. Gatens during and subsequent to the town hall meeting on August 26, 2019.

### **"Town Hall" Meeting - December 10, 2019**

122.    On December 10, 2019, County Supervisors/Administrator and the above-named

Defendants conducted a second "town hall" meeting which was attended by Plaintiff David M. Gatens.

123.    During this meeting, Plaintiff David M. Gatens emphatically repeated his prior complaints to County Supervisors, as expressed during and subsequent to the "town hall" meeting on August 26, 2019.

124.    On December 10, 2019, Plaintiff David M. Gatens further complained to County Supervisors that he had personally observed Supervisor Ms. Buskaritz writing out Christmas cards and watching soap operas on her laptop during working hours.

125.    During the December meeting, Plaintiff David M. Gatens identified and specified in detail each Plaintiff's complaints and concerns over safety issues and risks to the public, police, fire and EMS responders directly resulting from County Supervisors negligent and reckless operation of the 9-1-1 Center.

126.    Plaintiff David M. Gatens concluded his comments, that as a County resident concerned with the safety of his community, he lacked confidence in the County Administration and County Supervisors who were negligently and recklessly overseeing the operation of the 9-1-1 Center.

127.    Plaintiff David M. Gatens' remarks embarrassed and infuriated the above-named Defendants and all County Supervisors in attendance at the December "town hall" meeting.

### Permission for New Year's Toast With Alcohol - Defendant Kalynych Director of Emergency Services

128.    On December 31, 2019, 9-1-1 dispatchers brought food and soft drinks to celebrate the New Year.

129.     Prior to December 31, 2019, Ms. Alvarez-Carril spoke with Defendant Kalynych concerning preparation of a beverage for a single, New Year's toast.

130.     Ms. Alvarez-Carril requested permission from Defendant Kalynych to prepare a "Coquito" mixed drink which contains a negligible amount of alcohol for a single, New Year's toast utilizing a "mouthwash" size cup.

131.     Defendant Kalynych, pursuant to his authority as Director of Emergency Services, specifically gave Ms. Alvarez-Carril permission to prepare an utilize the "Coquito", eggnog-like beverage containing alcohol for the New Year's toast.

<u>**Use, Possession, Sale or Distribution of Alcoholic Beverages -**</u>
<u>**"Secret Santa Christmas Party"**</u>

132.     On numerous occasions, Defendant County Supervisors have acquiesced to, condoned and/or participated in the use, possession, sale or distribution of alcoholic beverages on County property.

133.     In December, 2019, multiple county employees, including supervisors and 9-1-1 dispatchers participated in a "Secret Santa Christmas Party."

134.     Defendant Kalynych, in his capacity as EMA Director and Nicole Kopec (hereinafter "Ms. Kopec"), in her capacity as an acting supervisor, agreed to make or purchase a Spanish alcohol mixed beverage called "Coquito" and to distribute this beverage to all participants in the "Secret Santa Christmas Party" which took place during working hours on County property.

135.     Ms. Kopec agreed to obtain the ingredients needed and to manufacture the "Coquito" mixed drink and Mr. Kalynych questioned whether this drink contained a sufficient

percentage of alcohol.

136.    Defendant Kalynych on a "Facebook" posting stated that there was not enough alcohol for the "Coquito" mix and asked whether he should  bring additional alcohol to the "Secret Santa Christmas Party."

137.    Defendant Kalynych's "Facebook" posting states "I only see two bottles of liquor should I get more?"

138.    A former city employee responded to Defendant Kalynych on Facebook by posting "Ooo I'll be right over."

139.    Ms. Kopec, as acting supervisor, brought more than a dozen mason jars containing the "Coquito" mix as gifts for the employees, including as a gift for Mr. Kalynych.

140.    Each mason jar contained a metal lid containing the name of the employee to whom it was a gift.

141.    At the "Secret Santa Christmas Party", several alcoholic beverages were exchanged as gifts among the employees/participants.

142.    As a result of the "Secret Santa Christmas Party" taking place on County property during the middle of some employees' shift, the mason jars containing the employees names and other alcoholic beverages given as gifts were placed on the floor of the  dispatch Communication Center room, in plain view for all supervisors, employees and visitors to the Communication Center.

143.    Neither Defendant Kalynych, Ms. Kopec nor any employee possessing or distributing alcoholic beverages at Defendant County's Communication Center during the "Secret Santa Christmas Party" were terminated from his or her employment.

**"Whiskey Exchange"**

144.     In December, 2019, subsequent to the monthly meeting of the Lehigh County

Commissioners, each Commissioner and Defendant Molchany participated in a "whiskey

exchange" at the conclusion of the meeting immediately preceding Christmas, 2019.

145.     The aforesaid "whiskey exchange", took place on County property and involved

the possession of alcoholic beverages by Defendant Molchany as well as the individual

Commissioners.

146.     Defendant Molchany was not terminated from his position as Director of General

Services for his possession and distribution of alcoholic beverages on County property in

violation of Defendant County's Disciplinary Standards and Procedures.

**Permission For New Year's Toast With Alcohol - Defendant Gehringer**
**Supervisor of Emergency Services**

147.     Prior to December 31, 2019, Ms. Alvarez-Carril spoke with Defendant Gehringer

concerning preparation of a beverage for a single, New Year's toast.

148.     Ms. Alvarez-Carril requested permission from Defendant Gehringer to prepare a

"Coquito" mixed drink which contained a negligible amount of alcohol for a single, New Year's

toast utilizing a "mouthwash" size cup.

149.     Defendant Gehringer, pursuant to her authority as Supervisor of 9-1-1

Communications specifically gave Ms. Alvarez-Carril permission to prepare and utilize the

Coquito eggnog-like beverage containing alcohol for the New Year's toast.

150.     Ms. Alvarez-Carril had witnessed the participation of Defendants Kalynych,

Gehringer, Ms. Kopec and Robin Hyndman (hereinafter "Ms. Hyndman") at previous "Secret

Santa Christmas Parties", including the party in December, 2019, wherein said individuals utilized mason jars to possess, transport and distribute alcohol on county property during working hours.

151.    Ms. Alvarez-Carril elected not to utilize mason jars to transport and/or display her eggnog beverage and decided that each employee would be offered a small, "mouthwash" sized cup to celebrate a toast at midnight.

152.    Ms. Alvarez-Carril did not announce whether her eggnog beverage contained alcohol.

153.    The quantity of beverage brought for a New Year's Eve toast was significantly less than the alcoholic beverages distributed and consumed by Defendants Kalynych, Gehringer, Ms. Kopec, Ms. Hyndman during the prior "Secret Santa Christmas Parties", including the party in December, 2019.

154.    At midnight, Ms. Alvarez-Carril, Plaintiffs and other dispatchers shared a New Year's Eve toast with the eggnog prepared by Ms. Alvarez-Carril and poured into "mouthwash" sized cups.

155.    Ms. Alvarez-Carril did not permit any employee, to consume any amount of eggnog beyond the single New Year's toast nor did she openly display the eggnog at the workplace.

156.    None of the Plaintiffs questioned whether the eggnog utilized for a single New Year's toast contained alcohol.

157.    No eggnog was consumed by Ms. Alvarez-Carril or Plaintiffs beyond the single New Year's toast.

-34-

158.    Ms. Alvarez-Carril advised Defendant County's supervisors that the majority, if not all of the dispatchers consumed the New Year's toast without being advised that the Coquito mix contained a negligible amount of alcohol.

159.    Ms. Alvarez-Carril further advised Defendant County's supervisors that the sharing of a New Year's Eve toast was a yearly tradition for the employees of the City of Allentown 9-1-1 Communications Emergency Call Center and one that was participated in by supervisory police officials and other police officers.

160.    Prior to participating in the New Year's toast, Ms. Alvarez-Carril, Plaintiffs, other supervisors and employees of Defendant County personally witnessed and/or were aware of the numerous occasions where alcoholic beverages were used, possessed and distributed on county property by County Supervisors and employees without any supervisor or employee being disciplined or terminated from his or her position.

## Civil Conspiracy

161.    Subsequent to the New Year's toast on January 1, 2020, Defendant Gehringer advised Defendant Molchany and the above-named Defendants that Plaintiffs had engaged in a New Year's toast prepared by Ms. Alvarez-Carril.

162.    Defendant Gehringer was aware at the time that she spoke with the above-named Defendants that she and Defendant Kalynych had given specific permission to Ms. Alvarez-Carril to utilize a "coquito" eggnog mix containing a minuscule amount of alcohol for said toast.

163.    At all times relevant to the within matter, Defendants Armstrong, Hozza, Molchany, Redding, Kalynych, Bailey and Gehringer had specific knowledge or should have been aware:

A.    that violations of Group Two offenses did not result in automatic termination from employment and in fact Defendants Molchany, Kalynych, Bailey and Gehringer regularly engaged in Group Two violations without being subjected to disciplinary repercussions;

B.    that Defendants Bailey and Gehringer had engaged in their own private business activities during working hours on Defendant County property and had engaged in Group Two violations of county policy without being disciplined for their actions;

C.    that alcoholic beverages had been possessed, distributed and consumed on Defendant County premises without any discipline being imparted;

D.    that Defendant Molchany had participated in a "whiskey exchange" toast with the Lehigh County Commissioners, wherein the participants made, possessed, exchanged and consumed alcoholic beverages during working hours and on Defendant County property;

E.    that Defendant Kalynych had personally possessed and distributed alcoholic beverages during working hours and on Defendant County property and that he and Defendant Gehringer had given specific permission to Ms. Alvarez-Carril to make and distribute the coquito beverage to the 9-1-1 staff for a New Year's toast; and

F.    that Defendant County's Guardian Tracking System contained documentation of numerous instances where 9-1-1 dispatchers were sleeping on the job, in violation of Group Two, without the individuals being terminated from their employment.

164.    Subsequent to being advised by Defendant Gehringer of Ms. Alvarez-Carril's New Year's toast, Defendants Molchany, Redding, Kalynych, Bailey and Gehringer entered into an agreement, understanding, plot, plan and conspiracy to terminate the above-named Plaintiffs in retaliation for their speech as citizens on matters of public concern, including the safety risks to the public, police, fire and EMS responders due to Defendants' negligent and reckless operation of the 9-1-1 Center.

**Morning Call Newspaper Article Dated January 12, 2020**

165.    On January 12, 2020, an article appeared in the Morning Call newspaper entitled "Lehigh County 9-1-1 Calls Taking Longer To Dispatch Since Merger of Allentown, County Centers". A copy of said article is attached hereto, marked Exhibit "C" and incorporated herein.

166.    The news article represented that from the date of transition of the 9-1-1 Emergency Services to Defendant County supervision on June 18, 2019 through October 28, 2019, calls to Defendant County's 9-1-1 Emergency Call Center took an average of 5.5 minutes to dispatch, whereas, the average from January, 2017 until June, 2019, was 3-5 minutes.

167.    Said article reflected the Plaintiffs' above-described complaints concerning Defendant County's negligent and reckless operation of the 9-1-1 Center and resulted from Defendant County's refusal to address Plaintiffs' safety related complaints.

168.    Said article further quoted Jeremy Warmkessel, head of Allentown Firefighters' Union, as stating that the response time was "definitely cause for concern ... If there's a two-minute longer dispatch, it's a huge difference in an actual fire."

169.    Said article further quoted a safety official as stating " But even a few minutes of lag in dispatch time can have dire consequences."

170.    The aforesaid article further reported concerns of other public officials, including former Allentown City Council President Darrell Hendricks and Eric Gratz, Chief of Operations for Allentown EMS, for the health and safety risks created by the inappropriate delays in response times.

171.    Defendant Molchany made various comments within the aforesaid article, including that "the merged 9-1-1 Emergency Call Center has been a success overall", that he was

-37-

"surprised by the dispatch times", that county officials have "yet to identify one key issue driving

the increase" and that new equipment required training and a "learning curve".

172.    During his interview, Defendant Molchany was questioned about complaints of

the inflexibility of the new computer system requiring certain fields to be filled in before a call

can be dispatched.

173.    The reporter reminded Defendant Molchany, that in the past, "Allentown

Dispatchers had the ability to override such requirements in their own system, immediately

sending a fire truck or ambulance to a call before they completed the forms and formally

dispatched the call."

174.    Defendant Molchany responded to this fact by incorrectly stating that "overrides

are not possible with the new system."

**Plaintiffs' Citizens' Speech - Response to January 12, 2020 News Article**

175.    Subsequent to the news article appearing on January 12, 2020, each Plaintiff

openly took issue with the comments attributed to Defendant Molchany within said article.

176.    On January 12 and January 13, 2020, Plaintiff Zucal openly

challenged/contradicted Defendant Molchany's comments.

177.    Plaintiff Zucal stated that each of the within Plaintiffs had advised County

Supervisors that, contrary to Defendant Molchany's statement, overrides were possible if the

dispatchers were properly trained.

178.    Plaintiff Zucal further stated that he had conducted successful overrides on

numerous occasions and had openly complained that overrides were not being administered by

other dispatchers due to their lack of proper training, poor attitude and the lack of supervision

and oversight on behalf of County Supervisors.

179.     Subsequent to the January 12, 2020 news article, each Plaintiff openly took issue with Defendant Molchany's comments, joined in Plaintiff Zucal's above-described comments and repeated his or her above-described prior complaints about the negligent and improper manner in which County Supervisors oversaw the operation of the 9-1-1 Center.

180.     Defendants, through Defendant Molchany, attempted to put a "good face" on the manner in which Defendant County had operated the 9-1-1 Emergency Call Center since June, 2019 and further tried to explain away the unacceptable and dangerous delays in response times since Defendant County assumed operations.

181.     Defendants, especially Defendant Molchany were infuriated by Plaintiffs' open response and rebuttal of Defendant Molchany's comments to the newspaper reporter and his attempt to justify the unacceptable, dangerous delay in response times.

182.     Each Plaintiff publicly challenged and rebutted Defendant Molchany's statements that he was surprised in the spike in dispatch times, that county officials had yet to identify one key issue driving the increase and that the new equipment required "a learning curve."

183.     Each Plaintiff was extremely vocal in repudiating Defendant Molchany's comments and pointed to the above-described problems that he or she had brought to the attention of the Defendant County Supervisors during the period from July, 2019 through January, 2020.

184.     In repudiating Defendant Molchany's statements, each Plaintiff publicly stated that his or her above-described complaints about Defendant County's negligent and reckless operation of the 9-1-1 Center had been specifically made known to all of the Defendants by

Plaintiff David M. Gatens during the Town Hall Meeting on August 26, 2019 and December 10, 2019.

### Conspiracy - Overt Act

185.    On or about January 13, 2020, Defendants Armstrong, Hozza, Molchany, Redding, Kalynych, Bailey and Gehringer took an overt act in furtherance of the earlier agreement, understanding, plot and plan to terminate each Plaintiff's employment as a direct retaliation for his or her engaging in protected citizens' speech on matters of public concern by forwarding emails and scheduling a pretextual "fact finding" conference for January 15, 2020.

186.    Defendants specified Plaintiffs' participating in the New Year's Eve toast as the sole reason for his or her termination and or forced resignation.

### Pretextual - Forced Resignations

187.    On January 15, 2020, Plaintiffs Zucal, Francis C. Gatens, Geiger, Landis and Palmer met individually with Mr. Redding for what Defendant Redding referred to as a "fact finding" process.

188.    Plaintiffs continued to work their regularly scheduled shifts on Thursday, January 16, 2020, Friday, January 17, 2020, Saturday, January 18, 2020, Sunday, January 19, 2020 and Monday, January 20, 2020.

189.    On Tuesday, January 21, 2020, Plaintiffs were ordered to attend individual meetings with Defendant Redding on Wednesday, January 22, 2020.

190.    During the aforesaid meetings with Defendant Redding, Plaintiffs learned for the first time that Defendant County Supervisors were alleging that they had  "drinking problems."

191.    At the aforesaid meetings, Defendant Redding advised Plaintiffs that they were

being terminated from their employment as of said date and that they were given an option to resign as opposed to being terminated.

192.    Defendant Redding misrepresented to Plaintiffs that it would be better for each Plaintiff if he or she resigned, as opposed to being terminated, and that his or her resignation would reflect that he or she was parting from his or her employment with Defendant County on "good terms."

193.    Defendant Redding further misrepresented to each Plaintiff that if he or she resigned and wrote a resignation letter, he or she could immediately re-apply for reinstatement to his or her position.

194.    During the meetings on January 22, 2020, Defendant Redding repeatedly assured each Plaintiff that if he or she resigned and wrote a resignation letter, it would reflect positively upon him or her and that he or she could immediately re-apply for his or her position.

195.    Defendant Redding knowingly and intentionally created a false impression that each Plaintiff would be re-hired to his or her position upon his or her tendering a formal resignation and writing a resignation letter.

196.    In sole reliance upon the misrepresentations of Defendant Redding, each Plaintiff tendered a resignation, wrote a resignation letter and immediately re-applied for reinstatement.

197.    The applications for reinstatement filed by Plaintiffs Zucal, Francis C. Gatens, Geiger, Landis and Palmer were ignored and dismissed by Defendant County's supervisory/ management level personnel.

**Pretextual Firings**

198.    On January 15, 2020, Plaintiffs David M. Gatens and Kirchner met with

-41-

Defendant Redding for what Defendant Redding referred to as a "fact finding" process.

199.     Plaintiffs David M. Gatens and Kirchner continued to work their regularly scheduled shifts on Thursday, January 16, 2020, Friday, January 17, 2020, Saturday, January 18, 2020, Sunday, January 19, 2020 and Monday, January 20, 2020.

200.     On Tuesday, January 21, 2020, Plaintiff David M. Gatens and Kirchner were ordered to attend individual meetings with Defendant Redding.

201.     During the aforesaid individual meetings with Defendant Redding, Plaintiffs D. Gatens and Kirchner learned for the first time that Defendant County's supervisors were alleging that they had a "drinking problem."

202.     At the aforesaid individual meetings, Defendant Redding advised Plaintiffs D. Gatens and Kirchner that they were being terminated from their employment as of said date.

203.     At the close of the individual meetings with Defendant Redding Plaintiffs D. Gatens and Kirchner were escorted by Defendant Redding and Ms. Darbe DeHaven from the premises and made to feel like they were criminals.

204.     The sole reason offered by Defendants for forcing the resignations of Plaintiffs Zucal, Francis C. Gatens, Geiger, Landis and Palmer and terminating Plaintiffs David M. Gatens and Kirchner, was that each individual participated in a single, New Year's toast involving the "coquito" eggnog mix which contained a minuscule amount of alcohol.

205.     Defendants terminated Ms. Alvarez-Carril at the same time that they terminated Plaintiffs David M. Gatens and John S. Kirchner.

206.      As further confirmation of the pretextual forced resignations and firings of Plaintiffs, Lehigh County Commissioner Dan Hartzell, upon learning of the above-described

New Year's toast, deemed the conduct of Plaintiffs to be "innocuous."

**Selective Discipline - Violation of Disciplinary Standards**

207.    At all times relevant to the within action, Defendant County's Disciplinary

Standards and Procedures included a group of offenses purporting to be subject to immediate

dismissal.

208.    According to Defendant County's Disciplinary Standards and Procedures B.1: An

employee is subject to immediate dismissal for "Mistreatment/harassment/bullying of the public,

residents, clients, co-workers, supervisors and/or Management."

209.    Section B.10 of Defendant County's Disciplinary Standards and Procedures

subjects an employee to immediate dismissal for the "Use, **possession,** sale or distribution of

alcoholic beverages and/or illegal or unauthorized drugs during working hours."

210.    Section B.15 of Defendant County's Disciplinary Standards and Procedures

further subjects employees to immediate dismissal for "Sleeping on the job during assigned

working hours."

211.    Section B.19 of Defendant County's Disciplinary Standards and Procedures

subjects an employee to immediate dismissal for "Violations of ethics, provisions of the Lehigh

County Home Rule Charter or Administrative Code as amended."

212.    Section B.20 of Defendant County's Disciplinary Standards and procedures

subjects an employee to immediate dismissal for "Violation of Lehigh County Code of Ethics."

213.    On numerous occasions, County employees who did not openly oppose the

County's discriminatory policies, lack of proper County safety policies, the resulting safety risks

to County residents or engage in protected speech, committed blatant violations of the above-

-43-

quoted disciplinary mandates without being terminated or disciplined.

**Violation of Ethics, Home Rule Charter or Administrative Code**

214.    On one occasion, Defendant Gehringer, in her capacity as a 9-1-1 Emergency Call Center Supervisor, photoshopped a picture of Ms. Bailey's face on a picture of a heavyset female in a bikini.

215.    Defendant Gehringer was not terminated from her employment for her harassing conduct.

216.    On another occasion, Daniel Rohrbach (hereinafter "Mr. Rohrbach"), a 9-1-1 dispatcher, made a post on Snapchat promoting violation of Defendant County Ethics Policy pertaining to work attire.

217.    Mr. Rohrbach's conduct also violated County disciplinary policies pertaining to unauthorized photography, videography and voice recording within the 9-1-1 Communications Center.

218.    Mr. Rohrbach was not terminated for his violative conduct.

**Sleeping During Working Hours**

219.    On October 19, 2019, Donald Smith (hereinafter "Mr. Smith") in his capacity as an a administrator/supervisor for Defendant County, witnessed a 9-1-1 dispatcher sleeping during working hours/during the dispatcher's shift.

220.    At all times relevant to the within matter, Defendant County's Communication Center utilized a software entitled "Guardian Tracking" to report, in part, any improper activity.

221.    Mr. Smith sent an email to the communications management documenting what he witnessed and entered his email into Defendant County's internal Guardian system.

222.    The dispatcher who was sleeping on the job was not terminated for his violating Defendant County's Disciplinary Standards and Procedures.

223.    Plaintiffs aver that there are numerous, documented incidents of County employees sleeping during working hours contained in Defendant County's internal Guardian system, including incidents where employees have slept through entire radio transmissions and phone calls extending over a period of hours.

224.    Plaintiffs further aver that none of the employees caught sleeping during working hours were terminated from his or her employment.

225.    In April, 2020, a County employee was seen sleeping during working hours which resulted in an official, written warning from Defendant County's Human Resources Department.

226.    The employee who was sleeping during working hours in April, 2020, was not terminated for violating Defendant County's Disciplinary Standards and Procedures.

**Statutory Mandates 9-1-1 Center - Public Safety - Public Concern**

227.    According to the Pennsylvania Emergency Management Agency (hereinafter "PEMA"), the ability to effectively communicate with a 9-1-1 Emergency Call Center for emergency assistance is a vital part of public safety and is the primary, if not only, method for the public to gain quick and immediate access to lifesaving emergency services.

228.    Pursuant to statutory authority (Title 35 Pennsylvania Consolidated Statutes) PEMA set forth a plan for 9-1-1 systems within the Commonwealth of Pennsylvania which was originally established in 2015 and updated in 2018.

229.    According to the aforesaid statutory mandate the City of Allentown and Lehigh County 9-1-1 Centers were merged and Plaintiffs received their positions as 9-1-1 dispatchers as

-45-

mandated by statute.

230.     Accordingly, all matters concerning the operation of the 9-1-1 Center and any resulting problems causing delays in the public gaining immediate access to lifesaving emergency services are matters of public concern.

231.     Plaintiffs' above-described complaints to County Supervisors about the above-described problems at the 9-1-1 Center involved matters of public safety and public concern.

232.     Plaintiffs' complaints resulted from their own personal observations as well as their conversations with members of the public, including members of the police, fire and emergency services departments concerning safety issues created by the negligent manner in which the 9-1-1 Center was operated and supervised by County Supervisors.

233.     Plaintiffs' above-described complaints resulted from their personal observations as employees within the 9-1-1 Center but did not involve each Plaintiff's job responsibilities as a dispatcher.

### Plaintiffs' Warnings

234.     During the period from July, 2019 through January, 2020, each Plaintiff feared and warned of possible tragic consequences due to Defendant County's refusal to heed their complaints and suggestions.

235.     Each Plaintiff complained to County Supervisors that the 9-1-1 Center was a hostile environment to callers who were minorities and were not fluent in the English language, especially Latinos/Hispanic callers.

236.     On numerous occasions, each Plaintiff warned that the lapse of language line coverage due to Defendant Bailey's refusal to pay for said services could result in tragedy.

-46-

**Policies- Custom- Retaliation- Disparate Treatment**

237.     At all times during the course of their employment, Plaintiffs were qualified

to perform their job responsibilities and did so in an exemplary manner.

238.     Defendant County, by and through its supervisory/management level employees,

treated other employees who did not engage in citizen's speech on matters of public concern

more favorably than Plaintiffs.

239.     Ms. Kopec, who personally possessed and transported to County property more

than a dozen mason jars containing alcoholic beverages for the "Secret Santa Christmas Party"

was not terminated from his employment for violating Defendant County's Disciplinary

Standards and Procedures.

240.     Defendant Kalynych who possessed and distributed alcoholic beverages during

the "Secret Santa Christmas Party" was not terminated from his position from violating County's

Disciplinary Standards and Procedures.

241.     Defendant Molchany was not terminated from his position for using, possessing

and distributing alcoholic beverages on County property during the December, 2019,Whiskey

Exchange with the Lehigh County Commissioners subsequent to a Commissioners' meeting, in

violation of Defendant County's Disciplinary Standards and Procedures.

242.     Defendant Gehringer, a 9-1-1 supervisor, was not terminated from her position for

photoshopping a picture of Ms. Bailey's face unto a heavyset female in a bikini in violation of

Defendant County's Disciplinary Standards and Procedures.

243.     Mr. Rohrbach was not terminated from his position for promoting violations of

Defendant County's Ethics policy pertaining to work attire and/or policies governing

unauthorized photography, videography and voice recordings inside the Communications Center in violation of Defendant County's Disciplinary Standards and Procedures.

244.     Several of Defendant County's employees, including 9-1-1 dispatchers, were not terminated from their employment for sleeping on the job during assigned work hours in violation of Defendant County's Disciplinary Standards and Procedures.

245.     On another occasion, a 9-1-1 dispatcher sprayed an aerosol can/bathroom air freshener on another employee.

246.     The employee who was sprayed developed respiratory problems and was forced to seek emergency treatment at a local hospital.

247.     The conduct of the employee who sprayed his co-employee violated Defendant County's Disciplinary Standards and Procedures however, no discipline was imparted to said employee.

248.     On another occasion, a co-employee of Plaintiffs physically assault another employee, in violation of Defendant County's Disciplinary Standards and Procedures without being terminated for his criminal conduct.

249.     Said employee was merely made to apologize to the co-employee that he had assaulted.

250.     Another co-employee/trainee indicated that he was going to come to work with a gun "shoot up the office" and shoot a co-employee.

251.     Said employee received no counseling or discipline for his criminal, terroristic threats and on the contrary, his conduct was deemed a "non-issue" by Defendant County and its supervisory/management level personnel.

-48-

252.     Plaintiff Zucal witnessed co-employees transporting and possessing weapons at the workplace, in violation of Defendant County's Standards and Procedures without each individual receiving counseling and/or any discipline.

253.     None of the above-mentioned individuals opposed or objected to discriminatory practices of County Supervisors against Ms. Alvarez-Carril or to the safety issues created by the reckless and negligent manner in which County Supervisors oversaw the operation of the 9-1-1 Center.

254.     Each of the offenses described above are listed under Defendant County's Disciplinary Standards and Procedures as "Second Group Offenses" which "Are subject to immediate dismissal."

255.     None of the above individuals was terminated from his or her employment for violations which were subject to immediate termination.

256.     County Supervisors afforded the above-described individuals and others identified in the "Guardian System" more favorable treatment than Plaintiffs because said individuals did not speak out as citizens on matters of public concern nor did said individuals oppose Defendant County's above-described  discriminatory practices.

### Defendants' Reckless Indifference-*Monell*

257.     Defendant Armstrong, as Lehigh County Executive, knew of  Plaintiffs' citizens' speech on matters of public concern and the safety risks to the public resulting from his ignoring Plaintiffs' complaints, including his subjecting of citizens and public safety officials to an unnecessary risk of harm.

258.     Defendant Armstrong knew or should have known, that on a regular and ongoing

basis, including during the Christmas holidays that alcohol was possessed, exchanged and/or consumed during working hours on county property.

259.    Defendant Hozza as Director of Administration for Defendant County knew or should have known of the Plaintiffs' citizens' speech on matters of public concern and the safety risks to the public resulting from his ignoring said complaints, including placing citizens and public safety officials at an unnecessary risk of harm.

260.    Defendant Hozza knew or should have known, that on a regular and ongoing or ongoing basis, including during the Christmas holidays that alcohol was possessed, exchanged and/or consumed during working hours on county property.

261.    As a result of Defendants' custom and policies of retaliating against employees engaged in protected speech as citizens on matters of public concern and Defendants' sheer reckless indifference to Plaintiffs' complaints and suggestions, county residents have been subjected to unnecessary risk of harm and tragedy.

### Fire - July, 2019

262.    On July 27, 2020, Heriberto Santiago, Jr. (hereinafter "Mr. Santiago") was a forty-four (44) year old resident of Lehigh County residing at 739 North Fair Street, Allentown, Lehigh County, Pennsylvania 18102 and was employed as a forklift operator/warehouse worker at Walmart, Trexlertown, Pennsylvania.

263.    Andres Javier Ortiz, was a fourteen (14) year old minor residing at 739 North Fair Street, Allentown, Lehigh County, Pennsylvania 18102.

264.    On July 27, 2020, a fire occurred at the premises 739 North Fair Street, Allentown, Lehigh County, Pennsylvania;

265. On July 27, 2020, Andres Javier Ortiz reacted to the fire by immediately awakening his uncle, Heriberto Santiago, Jr., who was asleep in the premises;

266. Mr. Santiago made a 9-1-1 telephone call to the Lehigh County 9-1-1 Emergency Call Center.

267. Mr. Santiago, in his native Spanish language, attempted to notify the 9-1-1 dispatcher of the fire and his need for emergency assistance;

268. The 9-1-1 dispatcher with whom Mr. Santiago spoke is believed to be a former county employee named Sonya O'Brien.

269. The 9-1-1 dispatcher, believed to be Ms. O'Brien, did not speak or understand the Spanish language nor did she utilize a Spanish language help line nor did any other dispatcher assist her in this regard;

270. Mr. Santiago persisted and frantically begged the 9-1-1 dispatcher for emergency assistance.

271. The 9-1-1 dispatcher/Ms. O'Brien indicated that she did not understand the Spanish language, told Mr. Santiago to speak English and hung up on Mr. Santiago;

272. As a result of the 9-1-1 dispatcher's/Ms. O'Brien's lack of training, uncaring, negligent, reckless and outrageous conduct in hanging up on Mr. Santiago and failing to take all steps to provide emergency assistance, Mr. Santiago and Mr. Ortiz perished in the fire.

273. According to the coroner's report, Mr. Santiago and Mr. Ortiz died from smoke inhalation and carbon monoxide toxicity.

### July 2, 2021 - Fireworks

274. On July 2, 2021, a County 9-1-1 dispatcher was away from his work station,

sitting on the roof of his building and watching a public fireworks display.

275.    As a direct result of the lack of training and supervision by Defendant County, said dispatcher was improperly away from his work position and missed calls for emergency relief concerning multiple shootings which occurred at that time in Lehigh County.

276.    The deadly fire of July, 2019 and the missed emergency calls from shooting incidents during the fireworks display were the direct result of Defendants reckless indifference to the safety and well-being of county residents and to the Plaintiffs' protected right to speak as citizens on matters of public concern.

**COUNT I**
**PLAINTIFFS VS. ALL DEFENDANTS**
**FIRST AMENDMENT- FREEDOM OF SPEECH**
**42 U.S.C. 1983 - RETALIATION**

277.    Plaintiffs incorporate Paragraphs 1 through 276 above as though the same were more fully set forth at length herein.

278.    Plaintiffs aver that the ability to effectively communicate with a 9-1-1 Emergency Call center for emergency assistance is a vital part of public safety and is the primary, if not only, method for the public to gain quick and immediate access to lifesaving emergency services.

279.    Plaintiffs further aver that all matters involving the management and operation of the 9-1-1 center are matters of public concern.

280.    Plaintiffs further aver that all safety risks resulting from the negligent supervision, lack of proper training and safety policies concerning the 9-1-1 center are matters of public concern.

281.    Defendants may not constitutionally compel Plaintiffs to relinquish their

constitutional rights that they would otherwise enjoy as citizens to speak on matters of public interest or concern.

282. Plaintiffs' above-described speech was made as citizens on matters of public concern.

283. Defendants Armstrong, Hozza, Redding, Molchany, Kalynych, Bailey and Gehringer were opposed to and were angered by Plaintiffs' exercising their rights to freedom of speech as a citizens on matters of public concern.

284. The aforesaid Defendants entered into a conspiracy and joined in an agreement, plan and/or plot to retaliate against Plaintiffs, damage Plaintiffs' reputation, terminate Plaintiffs as 9-1-1 dispatchers due to Plaintiffs exercising their rights to freedom of speech regarding matters of public concern.

285. Defendants Armstrong, Hozza, Redding, Molchany, Kalynych, Bailey and Gehringer acting under color of state law, including but not limited to any color of any statute, ordinance, regulation, custom or usage and motivated by prejudice against Plaintiffs due to Plaintiffs' exercise of their First Amendment rights, including their right to freedom of speech as citizens on matters of public concern, engaged in conduct that deprived Plaintiffs of their rights, privileges and/or immunities as secured by the Constitution of the United States of America, the applicable statutes and case law therein.

286. Plaintiffs aver that their exercising of their rights under the First Amendment, including their rights to free speech as citizens on matters of public concern, were substantial and motivating factors in the unlawful and retaliatory conduct of Defendants as more fully set forth above.

287.     Defendant County has acquiesced to, adopted, condoned and participated in the above-described wrongful and discriminatory conduct of Defendants Armstrong, Hozza, Redding, Molchany, Kalynych, Bailey and Gehringer.

288.     At all times herein mentioned, Defendant County had an official policy or custom of engaging in retaliation against employees who exercised their First Amendment rights, including their rights to freedom of speech as citizens on matters of public concern.

289.     Defendant County was recklessly indifferent to its policymakers/decisionmakers, supervisory/management level employees who engage in retaliation against employees/ individuals who exercise their First Amendment rights including their rights to freedom of speech as citizens on matters of public concern.

290.     Plaintiffs' speech was not pursuant to their duties and responsibilities with the 9-1-1 Center and constituted citizens' speech.

291.     The above-described disciplinary action imparted by Defendants was contemporaneous to Plaintiffs' above-described citizens' speech on matters of public concern.

292.     Defendants' custom and policy of retaliating against employees/individuals who exercise their First Amendment rights was a direct and proximate cause of the deprivation of Plaintiffs' rights and their resulting injuries and damages.

293.     As a result of the aforesaid actions of Defendants, Plaintiffs have sustained and will continue to sustain damages, including mental anguish, emotional distress, embarrassment, humiliation, outrage, damage to their reputations, loss of present and future opportunities as 9-1-1 dispatchers.

WHEREFORE, Plaintiffs Zucal, D. Gatens, F. Gatens, Kirchner, Geiger, Landis and

Palmer respectfully request that this Honorable Court enter judgment in their favor and against Defendants, jointly and severally and determine that Plaintiffs have suffered the substantial and continuing injuries set forth above and that said injuries resulted from the deprivation of their civil and constitutional rights, discrimination and other wrongful conduct by Defendants and award Plaintiffs the following relief:

A. A declaration that Defendants have violated Plaintiffs' civil rights;

B. Compensatory damages for each Plaintiff in excess of One Hundred Fifty Thousand ($ 150,000.00) Dollars;

C. Punitive damages for each Plaintiff, as appropriate, against the individually named Defendants in their individual capacities;

D. Exemplary damages, as applicable;

E. Damages for emotional distress, pain and suffering;

F. Injunctive relief, including entering an Order enjoining Defendants and all supervisory and management level employees of the Defendant County from engaging in further violations of the right to freedom of speech and directing that they undertake a remedial program, provide regular and periodic training to their policymakers/decisionmakers and supervisory/ management level employees concerning the mandates of the First and Fourteenth Amendments to the United States Constitution;

G. Injunctive relief, including entering an Order immediately reinstating each Plaintiff to his or her position as a 9-1-1 dispatcher for Defendant County and restoring each Plaintiff's backpay, property rights and all benefits relating thereto;

H. Reimbursement to each Plaintiff for full backpay, to include raises, overtime and holidays, reimbursement for all short and long term sick days, compensation of backpay to include the overtime and incentive rates for working during the COVID-19 pandemic, double pay and other incentive pays offered by Defendants during the period from January, 2020 through the present.

I. Reinstatement of all seniority with matching pay scale;

J.      Attorney's fees, costs of suit and pre-judgment interest; and

K.      Such other equitable relief as this Honorable Court should deem just
and proper.

### COUNT II
### PLAINTIFFS VS. ALL DEFENDANTS
### FOURTEENTH AMENDMENT- DUE PROCESS
### 42 U.S.C.§ 1983

294.    Plaintiffs incorporate Paragraphs 1 through 293 above as though the same were more fully set forth at length herein.

295.    Defendants Armstrong, Hozza, Redding, Molchany, Kalynych, Bailey and Gehringer acting under color of state law, including but not limited to any color of any statute, ordinance, regulation, custom or usage and motivated by prejudice against Plaintiffs due to Plaintiffs' exercise of their First Amendment rights, including their right to freedom of speech as citizens on matters of public concern, engaged in conduct that deprived Plaintiffs of their rights, privileges and/or immunities as secured by the Constitution of the United States of America, the applicable statutes and case law therein.

296.    Pursuant to a statutory authority the Pennsylvania Emergency Management Agency set forth a plan for 9-1-1 systems within the Commonwealth of Pennsylvania which was originally established in the calendar year 2015 and updated in the calendar year 2018.

297.    According to statutory mandate all city and county 9-1-1 emergency centers were to be merged on or before July, 2019.

298.    In accordance with said statutory mandate the 9-1-1 emergency centers of the City of Allentown and Defendant County were merged effective June, 2019.

299.    Plaintiffs aver that their employment as 9-1-1 dispatchers was predicated

upon and a derivative of the aforesaid statutory legislation enacted on behalf of PEMA.

300.    Plaintiffs further aver that pursuant to the aforesaid statutory mandates, their positions as 9-1-1 dispatchers with Defendant County were fundamental property rights which could not be deprived without due process of law.

301.    Plaintiffs had fundamental property rights which further include reimbursement for the statutorily mandated medical and health benefits and reimbursement for all short and long term sick days.

302.    Defendants, as a direct retaliation for Plaintiffs' protected activity, and in violation of Plaintiffs' civil rights, stripped and deprived Plaintiffs of their above-described property rights without due process of law.

303.    Plaintiffs had the liberty and right to perform a valuable governmental function by serving as 9-1-1 dispatchers for Defendant County, without unreasonable governmental interference.

304.    During the period from January 1, 2020 through January 23, 2020, Defendants made defamatory, false and damaging accusations against Plaintiffs which were disseminated publicly through the media, workplace and the pipeline of information existing within Defendant County.

305.    The Defendants' defamatory, false and damaging statements created a false and defamatory impression which was stigmatizing to Plaintiffs and damaging to their good names and reputations.

306.    Defendants utilized the aforesaid information pipeline to disseminate the aforesaid defamatory impression throughout Defendant County and the surrounding counties.

307.   Plaintiffs had liberty interests in their good names and reputations and their right to serve as 9-1-1 dispatchers in other surrounding counties without interference by Defendants.

308.   Defendants' attacks on Plaintiffs' reputations and good names have damaged Plaintiffs' attempts to serve as firefighters elsewhere.

309.   Each Plaintiff had a right to a name clearing hearing to address the false, stigmatizing and professionally damaging information being disseminated by Defendants.

310.   Defendants surreptitiously denied Plaintiffs' requests for name-clearing hearings by falsely promising that if each Plaintiff simply reapplied for his or her position his or her application for re-employment would be positively considered by Defendant County.

311.   Defendants never provided Plaintiffs with name clearing hearings and on the contrary, misled Plaintiffs into believing that by foregoing any appeal process and reapplying for his or her position, each Plaintiff would be rehired by Defendant County.

312.   Plaintiffs were terminated and/or misled into resigning without ever being afforded a proper name clearing hearing.

313.   Defendant County had a further duty to supervise and control the actions of Defendants Armstrong, Hozza, Redding, Molchany, Kalynych, Bailey and Gehringer and to protect Plaintiffs from the conspiratorial and improper conduct of said Defendants.

314.   At all times relevant to the within action, Defendant County breached its duties to its employees, including Plaintiffs.

315.   Defendants' wrongful conduct, in addition to infringing upon and damaging Plaintiffs' reputations, has deprived Plaintiffs of their above-described First Amendment rights,

Fourteenth Amendment rights and ability to serve as 9-1-1 dispatchers within Defendant County and elsewhere.

316.    Plaintiffs cannot be deprived of their liberty or property interests, without due process of law.

317.    The actions of the Defendants violated Plaintiffs' liberty and property interests as guaranteed by the Fourteenth Amendment to the United States Constitution.

318.    Defendant County has acquiesced to, adopted, condoned and participated in the above-described wrongful and discriminatory conduct of Defendants Armstrong, Hozza, Redding, Molchany, Kalynych, Bailey and Gehringer.

WHEREFORE, Plaintiffs Zucal, D. Gatens, F. Gatens, Kirchner, Geiger, Landis and Palmer respectfully request that this Honorable Court enter judgment in their favor and against Defendants, jointly and severally and determine that Plaintiffs have suffered the substantial and continuing injuries set forth above and that said injuries resulted from the deprivation of their civil and constitutional rights, discrimination and other wrongful conduct by Defendants and award Plaintiffs the following relief:

      A.     A declaration that Defendants have violated Plaintiffs' civil rights;

      B.     Compensatory damages for each Plaintiff in excess of One Hundred Fifty Thousand ($ 150,000.00) Dollars;

      C.     Punitive damages for each Plaintiff, as appropriate, against the individually named Defendants in their individual capacities;

      D.     Exemplary damages, as applicable;

      E.     Damages for emotional distress, pain and suffering;

      F.     Injunctive relief, including entering an Order enjoining Defendants and

all supervisory and management level employees of the Defendant County from engaging in further violations of the right to freedom of speech and directing that they undertake a remedial program, provide regular and periodic training to their policymakers/decisionmakers and supervisory/ management level employees concerning the mandates of the First and Fourteenth Amendments to the United States Constitution;

G.     Injunctive relief, including entering an Order immediately reinstating each Plaintiff to his or her position as a 9-1-1 dispatcher for Defendant County and restoring each Plaintiff's backpay, property rights and all benefits relating thereto;

H.     Reimbursement to each Plaintiff for full backpay, to include raises, overtime and holidays, reimbursement for all short and long term sick days, compensation of backpay to include the overtime and incentive rates for working during the COVID-19 pandemic, double pay and other incentive pays offered by Defendants during the period from January, 2020 through the present.

I.     Reinstatement of all seniority with matching pay scale;

J.     Attorney's fees, costs of suit and pre-judgment interest; and

K.     Such other equitable relief as this Honorable Court should deem just and proper.

## COUNT III
## PLAINTIFFS VS. DEFENDANT COUNTY OF LEHIGH
## 42 U.S.C. § 1983 - MUNICIPAL/*MONELL* LIABILITY

319.    Plaintiffs incorporate Paragraphs 1 through 318 above as though the same were more fully set forth at length herein.

320.    A single action may represent an act of "official government policy" if the acting official is an authorized decisionmaker.

321.    Plaintiffs may prove that Defendant County, by and through its policymakers, decisionmakers and supervisory/management level employees, acted pursuant to a custom to retaliate against Plaintiffs for their First Amendment activity, even if said custom did not receive

formal approval through the decisionmaking channels of the Defendant County.

322.    At all times relevant to the within action, Defendants have developed and maintained official policies and customs of retaliating against individuals who engaged in constitutionally protected activity and who exercise their First Amendment right to free speech.

323.    Defendant County's aforesaid official policies and customs of violating employees' rights resulted in the violation of Plaintiffs' Fourteenth Amendment right to due process, an illegal stripping of their property rights, a violation of Plaintiffs' liberty interest in their names and reputations and violations of Plaintiffs' ability to perform governmental function as 9-1-1 dispatchers in surrounding municipalities, boroughs and counties.

324.    Defendant County, by and through its policymakers, decisionmakers and supervisory/management level employees, has acted pursuant to said policy and custom and engaged in the constitutional deprivations more fully described above.

325.    Defendant County developed or maintained policies or customs exhibiting deliberate indifference to the constitutional rights of individuals/employees, including their rights to speak as citizens on matters of public concern and their due process rights protected by the Fourteenth Amendment.

326.    Defendant County developed or maintained policies or customs exhibiting deliberate indifference to unjust, unlawful and retaliatory practices by its policymakers, decisionmakers and supervisory/management level employees, wherein individuals, such as Plaintiffs, were retaliated against for exercising their First Amendment rights to citizens' speech on maters of public concern and deprived of their Fourteenth Amendment right to due process.

327.    Defendant County failed or refused to mandate the appropriate in-service training or discipline for its supervisory or management level agents or employees who were responsible for protecting the civil and constitutional rights of individuals/employees such as Plaintiffs.

328.    Defendant County has maintained inadequate and defective policies, customs and practices in the hiring of its policymakers, decisionmakers and supervisory/ management level employees, including all of the individually named Defendants herein.

329.    Defendant County has maintained inadequate and defective policies, customs and practices of training its supervisory/management level employees concerning the constitutionally protected rights of individuals, including Plaintiffs.

330.    Defendant County failed to adopt policies which were necessary to avoid or prohibit misconduct and/or civil and constitutional rights violations.

331.    As a result of the defective and inadequate policies, customs and deliberate indifference described above and the failure to conduct proper screening, interviewing, training, re-training and failure to adopt the necessary and appropriate disciplinary policies, Defendants, including Defendants Armstrong, Hozza, Redding, Molchany, Kalynych, Bailey and Gehringer believed that their actions would not be properly monitored and that their acts of misconduct would not be investigated, but rather would be tolerated, sanctioned and adopted.

332.    As a result of the existing policies, customs and deliberate indifference of Defendant County and the wrongful and unconstitutional conduct of its policymakers, decision-makers and supervisory/management level employees, individuals such as Plaintiffs have been subject to civil and constitutional rights violations.

333.    Defendant County has adopted, participated in, condoned and acquiesced to the above-described wrongful and unconstitutional conduct of its policymakers, decisionmakers and supervisory/management level employees and including that of Defendants Armstrong, Hozza, Redding, Molchany, Kalynych, Bailey and Gehringer.

334.    Defendant County has adopted, participated in, condoned and acquiesced to the above-described wrongful, negligent and unconstitutional conduct of Defendants Armstrong, Hozza, Redding, Molchany, Kalynych, Bailey and Gehringer in depriving Plaintiffs of their due process and appeal rights.

335.    The Defendant County's adopting and maintaining the above-described defective and inadequate policies and customs and its failure to enact the necessary policies demonstrated a conscious and deliberate indifference and disregard for the well-being and constitutional rights of Plaintiffs.

WHEREFORE, Plaintiffs Zucal, D. Gatens, F. Gatens, Kirchner, Geiger, Landis and Palmer respectfully request that this Honorable Court enter judgment in their favor and against Defendant County and determine that Plaintiffs have suffered the substantial and continuing injuries set forth above and that said injuries resulted from the deprivation of their civil and constitutional rights, discrimination and other wrongful conduct by Defendants and award Plaintiffs the following relief:

A.    A declaration that Defendant has violated Plaintiffs' civil rights;

B.    Compensatory damages for each Plaintiff in excess of One Hundred Fifty Thousand ($ 150,000.00) Dollars;

C.    Exemplary damages, as applicable;

-63-

D.      Damages for emotional distress, pain and suffering;

E.      Injunctive relief, including entering an Order enjoining Defendant and all supervisory and management level employees of the Defendant County from engaging in further violations of the right to freedom of speech and directing that they undertake a remedial program, provide regular and periodic training to their policymakers/decisionmakers and supervisory/ management level employees concerning the mandates of the First and Fourteenth Amendments to the United States Constitution;

F.      Injunctive relief, including entering an Order immediately reinstating each Plaintiff to his or her position as a 9-1-1 dispatcher for Defendant County and restoring each Plaintiff's backpay, property rights and all benefits relating thereto;

G.      Reimbursement to each Plaintiff for full backpay, to include raises, overtime and holidays, reimbursement for all short and long term sick days, compensation of backpay to include the overtime and incentive rates for working during the COVID-19 pandemic, double pay and other incentive pays offered by Defendant during the period from January, 2020 through the present.

H.      Reinstatement of all seniority with matching pay scale;

I.      Attorney's fees, costs of suit and pre-judgment interest; and

J.      Such other equitable relief as this Honorable Court should deem just and proper.

## COUNT IV
## PLAINTIFFS VS. DEFENDANTS REDDING, MOLCHANY, KALYNYCH, BAILEY AND GEHRINGER
## 42 U.S.C. § 1983 - CONSPIRACY

336.    Plaintiff hereby incorporates by reference the allegations in Paragraphs 1 through 335 as though the same were more fully set forth at length herein.

337.    Defendants Redding, Molchany, Kalynych, Bailey and Gehringer acting individually or in combination with each other under color of state law, including but not limited to color of any statute, ordinance, regulation, custom or usage and motivated by prejudice against

Plaintiffs, conspired with each other for the purpose of impeding, obstructing, hindering and defeating the due course of justice and with the intent to deny and deprive Plaintiffs of their well established First and Fourteenth Amendment rights to freedom of speech and right to due process, retaliated against Plaintiffs for exercising said rights and Defendant County condoned, acquiesced to, adopted and participated in the unlawful conduct of Defendants Redding, Molchany, Kalynych, Bailey and Gehringer.

338.    Defendants Redding, Molchany, Kalynych, Bailey and Gehringer, acting in combination with each other, entered an agreement or understanding to plot, plan or conspire to carry out the alleged chain of events and overt acts, causing Plaintiffs to suffer and sustain deprivations, injuries and special damages as more fully set forth herein.

339.    Defendants Redding, Molchany, Kalynych, Bailey and Gehringer improperly and unlawfully acted to impart unwarranted and unwelcome discipline to Plaintiffs in retaliation for Plaintiffs' exercising their well established First Amendment rights of freedom of speech as citizens on matters of public concern.

340.    The original agreement, understanding, plot, plan and conspiracy to retaliate against Plaintiffs for their exercising of their protected First Amendment rights was entered into subsequent to January 1, 2020, at which time Defendant Gehringer advised Defendants Redding, Molchany, Kalynych and Bailey of the Plaintiffs' New Year's toast which had been formally approved by Defendants Kalynych and Gehringer.

341.    Subsequent to January 12, 2020, Defendants Redding, Molchany, Kalynych, Bailey and Gehringer took overt acts in furtherance of the aforesaid conspiracy, by scheduling what they referred to as "a fact finding process", which was nothing more than a pretextual attempt to

terminate Plaintiffs Kirchner and David M. Gatens and to mislead and obtain the retirement under false pretenses of Plaintiffs Zucal, Francis C. Gatens, Geiger, Landis and Palmer.

342.    An overt act in furtherance of the above conspiracy was taken by Defendants Redding, Molchany, Kalynych, Bailey and Gehringer , who collaborated on and scheduled the "fact finding proceedings" wherein they terminated Plaintiffs Kirchner and David M. Gatens and misled and obtained the resignations under false pretenses from Plaintiffs Zucal, Francis C. Gatens, Geiger, Landis and Palmer.

343.    Pursuant to the aforesaid conspiracy Defendant Redding terminated Plaintiffs Kirchner and David M. Gatens from their 9-1-1 dispatcher positions.

344.    Pursuant to the aforesaid conspiracy Defendant Redding misled Plaintiffs Zucal, Francis C. Gatens, Geiger, Landis and Palmer into resigning their position under the false promise that they could immediately reapply and be rehired as 9-1-1 dispatchers.

345.    Defendant County, by and through Defendant Armstrong as County Executive and Defendant Hozza as County Administrator, acquiesced to, accepted, condoned, adopted and participated in the unlawful conduct of Defendants Redding, Molchany, Kalynych, Bailey and Gehringer and its elected officials, policymakers, decisionmakers and supervisory/management level personnel.

WHEREFORE, Plaintiffs Zucal, D. Gatens, F. Gatens, Kirchner, Geiger, Landis and Palmer respectfully request that this Honorable Court enter judgment in their favor and against Defendant County and determine that Plaintiffs have suffered the substantial and continuing injuries set forth above and that said injuries resulted from the deprivation of their civil and constitutional rights, discrimination and other wrongful conduct by Defendants and award

Plaintiffs the following relief:

A.      A declaration that Defendants have violated Plaintiffs' civil rights;

B.      Compensatory damages for each Plaintiff in excess of One Hundred Fifty Thousand ($ 150,000.00) Dollars;

C.      Punitive damages for each Plaintiff, as appropriate, against the individually named Defendants in their individual capacities;

D.      Exemplary damages, as applicable;

E.      Damages for emotional distress, pain and suffering;

F.      Injunctive relief, including entering an Order enjoining Defendants and all supervisory and management level employees of the Defendant County from engaging in further violations of the right to freedom of speech and directing that they undertake a remedial program, provide regular and periodic training to their policymakers/decisionmakers and supervisory/ management level employees concerning the mandates of the First and Fourteenth Amendments to the United States Constitution;

G.      Injunctive relief, including entering an Order immediately reinstating each Plaintiff to his or her position as a 9-1-1 dispatcher for Defendant County and restoring each Plaintiff's backpay, property rights and all benefits relating thereto;

H.      Reimbursement to each Plaintiff for full backpay, to include raises, overtime and holidays, reimbursement for all short and long term sick days, compensation of backpay to include the overtime and incentive rates for working during the COVID-19 pandemic, double pay and other incentive pays offered by Defendants during the period from January, 2020 through the present.

I.      Reinstatement of all seniority with matching pay scale;

J.      Attorney's fees, costs of suit and pre-judgment interest; and

K.      Such other equitable relief as this Honorable Court should deem just and proper.

<u>COUNT V</u>
**<u>PLAINTIFFS V. DEFENDANTS ARMSTRONG AND HOZZA</u>**
**<u>42 U.S.C. § 1983 - SUPERVISORY LIABILITY</u>**

346.    Plaintiffs hereby incorporate by reference the allegations in Paragraphs 1 through 345 as though the same were more fully set forth at length herein.

347.    Defendants Armstrong, Hozza, their policymakers and supervisors, acted in a supervisory or management capacity under circumstances and during the period when their subordinates, Defendants Redding, Molchany, Kalynych, Bailey and Gehringer violated the rights of Plaintiffs.

348.    At all times, the actions of Defendants Redding, Molchany, Kalynych, Bailey and Gehringer were accepted, approved, condoned and acquiesced to by Defendants Armstrong and Hozza, who acted in management or supervisory capacities and all Defendants acted under color of state law.

349.    Defendants Armstrong and Hozza and their supervisors directed the conduct which resulted in the violation of the federal rights of the Plaintiffs as alleged or had actual knowledge of the violation of said federal rights by the subordinate defendants and accepted, approved, condoned and acquiesced in said violations.

350.    Defendants Armstrong, Hozza and their supervisors acted with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused the violation of the civil rights of Plaintiffs or failed to maintain or enforce a policy under circumstances wherein one or more policies or regulations were necessary to protect the rights of Plaintiffs and other citizens.

351.    Defendants Armstrong and Hozza had specific knowledge or should have known

of the numerous instances wherein county employees consumed, possessed or distributed alcoholic beverages on County property during working hours without said employees being terminated from their employment or receiving meaningful discipline.

352.     Defendants Armstrong and Hozza had specific knowledge or should have known that in December, 2019, Defendant Molchany participated in a "whiskey toast" with several Lehigh County Commissioners on County property and during working hours without Defendants Armstrong or Hozza terminating or imparting meaningful discipline to Defendant Molchany for his violation of the County's Disciplinary Standards and Procedures.

353.     Defendants Armstrong and Hozza had specific knowledge or should have known that Defendants Kalynych and Bailey participated in numerous "Secret Santa Parties", including a party in December, 2019, wherein mason jars of alcohol were possessed, distributed and displayed on County property during working hours without Defendants Armstrong or Hozza terminating or imparting meaningful discipline to Defendants Kalynych and Bailey for their violation of the County's Disciplinary Standards and Procedures.

354.     Defendants Armstrong and Hozza had specific knowledge or should have known that Defendants Kalynych and Gehringer gave specific permission to Ms. Alvarez-Carril to engage in a New Year's toast utilizing a "coquito" eggnog mix containing a minimal amount of alcohol and Defendants Armstrong and Hozza did not terminate or impart meaningful discipline to Defendants Kalynych and Gehringer for giving express permission for said toast.

355.     Defendants Armstrong and Hozza had specific knowledge or should have known that not all Group Two violations of the County Disciplinary Standards and Procedures resulted in the termination of employment.

356.     Defendants Armstrong and Hozza had specific knowledge or should have known that the 9-1-1 Center maintained "Guardian Tracking" to report any improper activity.

357.     Defendants Armstrong and Hozza had specific knowledge of the unconstitutional conduct of Defendants Redding, Molchany, Kalynych, Bailey and Gehringer and intentionally acquiesced in this conduct by failing to establish proper procedures or by failing to adequately train and supervise said Defendants and other supervisory/management level employees.

358.     The conduct of Defendants Armstrong and Hozza was a proximate cause of the injuries and damages suffered by Plaintiffs, as set forth herein and the failure of Defendants Armstrong and Hozza to train or supervise Defendants Redding, Molchany, Kalynych, Bailey and Gehringer caused Plaintiffs to be deprived of their civil rights and as such, said supervisory Defendants Armstrong and Hozza are personally liable for all damages and injuries to Plaintiffs.

359.     The illegal and improper actions of Defendants Redding, Molchany, Kalynych, Bailey and Gehringer were a direct result of their lack of proper training and supervision by Defendants Armstrong, Hozza, their policymakers and supervisory/management level employees.

360.     As a further result of the aforesaid deficient supervision of Defendants Redding, Molchany, Kalynych, Bailey and Gehringer by Defendants Armstrong and Hozza, their policymakers and supervisory/management level employees, Plaintiffs suffered the damages set forth herein.

WHEREFORE, Plaintiffs Zucal, D. Gatens, F. Gatens, Kirchner, Geiger, Landis and Palmer respectfully request that this Honorable Court enter judgment in their favor and against Defendant County and determine that Plaintiffs have suffered the substantial and continuing injuries set forth above and that said injuries resulted from the deprivation of their civil and

constitutional rights, discrimination and other wrongful conduct by Defendants and award

Plaintiffs the following relief:

A.   A declaration that Defendants have violated Plaintiffs' civil rights;

B.   Compensatory damages for each Plaintiff in excess of One Hundred Fifty Thousand ($ 150,000.00) Dollars;

C.   Punitive damages for each Plaintiff, as appropriate, against the individually named Defendants in their individual capacities;

D.   Exemplary damages, as applicable;

E.   Damages for emotional distress, pain and suffering;

F.   Injunctive relief, including entering an Order enjoining Defendants and all supervisory and management level employees of the Defendant County from engaging in further violations of the right to freedom of speech and directing that they undertake a remedial program, provide regular and periodic training to their policymakers/decisionmakers and supervisory/ management level employees concerning the mandates of the First and Fourteenth Amendments to the United States Constitution;

G.   Injunctive relief, including entering an Order immediately reinstating each Plaintiff to his or her position as a 9-1-1 dispatcher for Defendant County and restoring each Plaintiff's backpay, property rights and all benefits relating thereto;

H.   Reimbursement to each Plaintiff for full backpay, to include raises, overtime and holidays, reimbursement for all short and long term sick days, compensation of backpay to include the overtime and incentive rates for working during the COVID-19 pandemic, double pay and other incentive pays offered by Defendants during the period from January, 2020 through the present.

I.   Reinstatement of all seniority with matching pay scale;

J.   Attorney's fees, costs of suit and pre-judgment interest; and

K.   Such other equitable relief as this Honorable Court should deem just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

361.   Plaintiffs hereby demand a jury trial on all issues of facts and damages

in this action.

Respectfully submitted,

*/s/Fredrick E. Charles*
Fredrick E. Charles, Esquire
Attorney I.D. Number 25691
Attorney for Plaintiffs
441 Linden Street
Allentown, PA 18102
(610) 437-7064