**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JUSTIN K. ZUCAL, *et al.*, | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Civil No. 5:21-cv-04598-JMG |
| | : | |
| COUNTY OF LEHIGH, *et al.*, | : | |
| Defendants. | : | |

**MEMORANDUM OPINION**

**GALLAGHER, J.**                                               **March 8, 2023**

Plaintiffs have filed an amended complaint against Defendants Lehigh County; Philip Armstrong, County Executive ("Armstrong"); Edward Hozza, Jr., County Administrator ("Hozza"); Marc Redding, Director of Human Resources ("Redding"); Richard D. Molchany, Director of General Services ("Molchany"); John Kalynych, Former Director of Emergency Services ("Kalynych"); Laurie Bailey, Former Director of Emergency Services ("Bailey"); and Christine Gieringer, 9-1-1 Supervisor ("Gieringer"),[1] alleging claims of First Amendment Retaliation, violations of Procedural Due Process and Title VII, and civil conspiracy. Plaintiffs have also brought a *Monell* claim and a Supervisory Liability claim. Presently before the Court is Defendants' motion to dismiss the amended complaint. For the following reasons, the motion is granted.

---

[1] In their motion to dismiss, Defendants state that Christine Gieringer's name is misspelled "Gehringer" in Plaintiffs' Amended Complaint. *See* Defs. Mot. to Dismiss Pls. Amend. Compl. (ECF No. 18) at 2.

I.    **ALLEGATIONS**[2]

In January 2019, the Allentown 911 Emergency Call Center ("Allentown 911 Call Center") merged with the Lehigh County 911 Emergency Call Center ("911 Call Center"). Amended Complaint, ECF No. 15 (Amend. Compl.) at ¶ 25.  Prior to the merger, plaintiffs Justin K. Zucal ("Zucal") and David M. Gatens ("David M. Gatens") worked as 911 dispatchers in the Allentown 911 Call Center while plaintiffs Francis C. Gatens ("Francis C. Gatens"), John S. Kirchner ("Kirchner"), Emily M. Geiger ("Geiger"), Julie L. Landis ("Landis"), and Brandi L. DeLong Palmer ("Palmer") worked as 911 dispatchers at the Lehigh County 911 Call Center.  *Id.* at ¶¶ 23-24.  Prior to the merger, Melissa Alvarez-Carril ("Alvarez-Carril") was a supervisor in the Allentown 911 Call Center.  *Id.* at ¶ 27.  Alvarez-Carril is not a party to this action.

Plaintiffs allege that following the merger, Lehigh County supervisory and management employees subjected Alvarez-Carril to racially hostile comments as well as racially hostile, false, and defamatory accusations.  *Id.* at ¶¶ 31-32.  Between January 2019 and January 2020, Alvarez-Carril observed 911 dispatchers commit severe errors and or negligent and reckless acts.  *Id.* at ¶ 33.   Alvarez-Carril documented and reported this conduct to county supervisors, including the Defendants, who responded with hostile and negative comments.  *Id.* at ¶ 34.  In one such incident, a 911 dispatcher failed to advise police and EMS of an individual's location, and as a result of the ensuing delay the individual died.  *Id.* at ¶¶ 35-36.  A 911 supervisor then informed other county supervisors that Alvarez-Carril had failed to handle an emergency 911 call.  *Id.* at ¶ 38.  Plaintiffs allege county supervisors began the termination process of Alvarez-Carril soon thereafter.  *Id.* at ¶ 39.

---

[2] On a motion to dismiss, we operate "on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Plaintiffs all complained to unidentified county supervisors about the discrimination of Alvarez-Carril and the racially hostile working environment of the 911 Call Center. *Id.* at ¶¶ 40-87. Plaintiffs claim unidentified county supervisors halted their attempt to terminate Alvarez-Carril for the handling of the call only after their complaints. *Id.* at ¶ 47. In addition to their complaints about the treatment of Alvarez-Carril, Plaintiffs lodged complaints up the pipeline to county supervisors and members of other agencies that worked alongside the 911 Call Center regarding the management and operation of the 911 Call Center. From July 2019 through January 2020, Zucal had ongoing discussions with members of the Allentown Police Department, and the Woodlawn and Allentown Fire Departments regarding the policies and management of the 911 Call Center. *Id.* at ¶¶ 123-25, 132-35, 148-49. He also made complaints to unidentified county supervisors, the subject of which included the city's digital radio system and other issues within the call center that led to delays in calls involving fire departments, the CAD system and dispatchers' failure to use the system properly, and dispatchers' failure to run license plates and otherwise obtain information from callers, which in turn led to delays. *Id.* at ¶¶ 123-25, 126-27, 132-38, 146-49. Zucal also made complaints about the workplace behavior of defendants Gieringer and Kalynych, and another co-worker. *Id.* at ¶¶ 142-44, 150-53.

Francis C. Gatens made similar complaints to unidentified county supervisors between July 2019 and January 2020. His complaints included issues with the CAD system and the conduct of fellow employees, including their failure to run license plates when handling 911 calls. *Id.* at ¶¶ 156-57. He also complained about a co-worker falling asleep on the job and using a personal device that distracted other dispatchers. *Id.* at ¶ 158. During this same time period he spoke regularly with members of the police departments in Slatington, Salisbury and Whitehall about the lack of training for 911 dispatchers, delays in response times and issues with the quality

3

of the radio systems.  *Id.* at ¶¶ 155.  Between July 2019 and January 2020, Kirchner regularly complained to unidentified county supervisors about similar issues.  His complaints included issues with the operation of radio systems during fire emergencies, the workplace behavior of fellow 911 dispatchers and lack of policies and supervision which all led to delays in response times.  *Id.* at ¶¶ 161-64.  He was also involved in discussions regarding safety issues with the Lehigh County Fire Chiefs' Association, EMS dispatchers and police officers.  *Id.* at ¶ 160.

Between July 2019 and January 2020, Geiger complained regularly to unidentified county supervisors.  Her complaints included issues with the digital radio system, the CAD system, the workplace behavior of fellow 911 dispatchers and a lack of policies and supervision which all led to delays in response times.  *Id.* at ¶¶ 167-71.  During that same period she also spoke regularly with members of the Slatington Police Department, Northampton Regional Emergency Medical Services and the Greenawalds Fire Department about the lack of training for 911 dispatchers, delays in response times and issues with the quality of the radio systems.  *Id.* at ¶¶ 165-66.

During this same time period, Plaintiff Palmer made two complaints to unidentified county supervisors regarding the 911 phone system crashing during a conversation with an emergency caller.  *Id.* at ¶ 172.  Palmer's complaints also included the lack of supervision of employees at the 911 Call Center, the workplace behavior of other dispatchers, and issues with the CAD system that led to delays.  *Id.* at ¶ 176.  Plaintiff Landis also made similar complaints to unidentified county supervisors during this same period about a lack of supervision of 911 Call Center employees and issues involving dispatchers' processing of 911 calls.  *Id.* at ¶¶ 177, 179.  Finally, Plaintiff David C. Gatens, who was a supervisor in the 911 Call Center, received these complaints from the other Plaintiffs and conveyed them to defendants Kalynych, Bailey, and other individuals.  *Id.* at ¶¶ 185-86.

In addition to her complaints regarding the safety issues at the 911 Call Center, Palmer made several troubling allegations of sexual misconduct. Palmer alleges that she was criticized by an unidentified male employee for taking breaks to pump breast milk, *id.* at ¶ 90; she was subjected to comments from unidentified supervisors regarding breast milk, *id.* at ¶¶ 91-93; she was harassed and inappropriately touched by an unidentified male co-worker, who also printed a photo of Palmer and placed it on a binder, *id.* at ¶¶ 93-94; and was subjected to inappropriate and harassing comments by unidentified co-employees for sitting next to another unidentified employee, *id.* at ¶¶ 99-100.

Following the merger, two townhall meetings were held with County executives, administrators and Defendants. *Id.* at ¶¶ 187-97. During the first meeting, held on August 26, 2019, David M. Gatens advised unidentified county supervisors and administrators of Plaintiffs' complaints described above. *Id.* at ¶ 188. Plaintiffs claim county supervisors did not respond to any of the complaints raised during this meeting. *Id.* at ¶ 190. Following the first Town Hall meeting, Plaintiff David M. Gatens repeated his complaints and the complaints of the other Plaintiffs to county supervisors. *Id.* at ¶ 190. The second meeting was held on December 10, 2019 with unidentified county supervisors and administrators and the Defendants. *Id.* at ¶ 192. During this meeting David M. Gatens repeated his complaints regarding the 911 Center, as well as the complaints of the other Plaintiffs. *Id.* at ¶¶ 193-95. He concluded his remarks by stating that as a county resident he was concerned for the safety of his community due to the negligent and reckless operation of the center. *Id.* at ¶ 196.

On December 31, 2019, Alvarez-Carril, Plaintiffs and other 911 dispatchers shared a New Year's Eve toast over small cups of eggnog. *Id.* at ¶ 224. Plaintiffs claim that Gieringer granted permission to Alvarez-Carril to use alcohol for the toast. *Id.* at ¶ 219. Plaintiffs also claim that

prior to the toast, they had observed supervisors and other Lehigh County employees use, possess, or distribute alcohol on county property without any discipline.  *Id.* at 230.

On January 12, 2020, an article appeared in the Morning Call newspaper discussing the newly merged 911 Call Center and dispatch delays following the merger.  *Id.* at ¶¶ 235-236. Plaintiffs contend the complaints raised in the article mirrored their own that were made previously.  *Id.* at ¶ 237.  Defendant Molchany was interviewed for the article and commented about the success of the center and his surprise at the dispatch times.  *Id.* at ¶ 241.  He also stated that county officials had yet to identify issues causing the delays in dispatch times, and that the new equipment at the center required training and a "learning curve."  *Id.*  Following publication of the article, Plaintiffs all complained openly about the statements made by Molchany and repeated their complaints about the operation of the 911 Call Center.  *Id.* at ¶¶ 246-49.  Plaintiffs allege that Defendants, in particular Defendant Molchany, were infuriated at their response to the article's publication.  *Id.* at ¶ 251.

On January 13, 2020, defendants Armstrong, Hozza, Molchany, Redding, Kalynych, Bailey and Gieringer forwarded emails to schedule a "fact finding" conference on January 15, 2020 in response to the New Year's toast.  *Id.* at ¶¶ 255-56.  As part of this process, on January 15, 2020, defendant Redding met with Plaintiffs Zucal, Francis C. Gatens, Geiger, Landis and Palmer.  *Id.* at ¶¶ 257, 268.  On January 21, 2020, Plaintiffs were all ordered to attend individual meetings with Redding the next day.  *Id.* at ¶ 259.  Plaintiffs claim that during these meetings with Redding, they learned that county supervisors were alleging they had "drinking problems." *Id.* at ¶¶ 260, 271.  During these meetings, Plaintiffs Zucal, Francis C. Gatens, Geiger, Landis and Palmer were told their positions were being terminated and they were given an opportunity to resign.  *Id.* at ¶ 261.  These plaintiffs claim Redding told them they could reapply for their

positions, and that resignation would look better than termination. *Id.* at ¶ 264. They subsequently resigned, wrote a resignation letter, and immediately applied for reinstatement. *Id.* at ¶ 266. Plaintiffs claim the applications for reinstatement were ignored and dismissed. *Id.* at ¶ 267. During their meetings with Redding that day, Plaintiffs David M. Gatens and Kirchner were informed their employment was being terminated and were subsequently escorted from the premises. *Id*. at ¶¶ 272-73. Defendants' purported reason for the termination was the consumption of alcohol on New Year's Eve. *Id.* at ¶ 274.

## II.    STANDARD

A complaint may be dismissed for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "Although the plausibility standard does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal quotation marks and citations omitted). In other words, "there must be some showing sufficient to justify moving the case beyond the pleadings to the next stage of litigation." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234–35 (3d Cir. 2008).

Third Circuit courts deploy a three-step analysis when faced with motions to dismiss. First, we identify "the elements [the] plaintiff must plead to state a claim." *Connelly*, 809 F.3d at 787 (quoting *Iqbal*, 556 U.S. at 675). Next, we "identify allegations that, because they are no

more than conclusions, are not entitled to the assumption of truth." *Id.* (quoting *Iqbal*, 556 U.S. at 679). Finally, we assume the veracity of well-pleaded factual allegations, "and then determine whether they plausibly give rise to an entitlement to relief." *Id.* (quoting *Iqbal*, 556 U.S. at 679). For purposes of this analysis, we "accept all factual allegations as true, [and] construe the complaint in the light most favorable to the plaintiff." *Warren Gen. Hosp. v. Amgen, Inc.*, 643 F.3d 77, 84 (3d Cir. 2011).

## III.   DISCUSSION

### a.   Motion to Dismiss First Amendment Retaliation Claim

Plaintiffs have alleged their employment was terminated in retaliation for their complaints about the management and operation of the 911 Call Center. Plaintiffs claim these complaints were not made pursuant to their positions as 911 dispatchers, but rather were made out of concern for public safety of the community and were thus protected under the First Amendment as citizen speech.

To prevail in a First Amendment retaliation claim, "a public employee must show (1) their speech is protected by the First Amendment and (2) the speech was a substantial or motivating factor in the alleged retaliatory action, which, if both are proved, shifts the burden to the employer to prove that (3) the same action would have been taken even if the speech had not occurred." *Munroe v. Cent. Bucks Sch. Dist.*, 805 F.3d 454, 466 (3d Cir. 2015), *as amended* (Oct. 25, 2019) (quoting *Dougherty v. Sch. Dist. of Philadelphia*, 772 F.3d 979, 986 (3d Cir. 2014)). For a public employee's speech to be protected by the First Amendment, the employee must speak as a citizen and not as an employee, "the speech must involve a matter of public concern," and "the government must lack an 'adequate justification' for treating the employee differently than the general public based on its needs as an employer under the *Pickering*

balancing test." *Dougherty*, 772 F.3d at 987 (citing *Gorum v. Sessoms*, 561 F.3d 179, 185 (3d Cir.2009)).

1. Citizen Speech

When confronted with a First Amendment retaliation claim involving a public employee, courts must first consider whether the speech was made in the capacity of an employee or a citizen. *Garcetti v. Ceballos*, 547 U.S. 410, 417-18 (2006). The Supreme Court has stated when a public employee speaks "pursuant to their official duties," they "are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421. The Supreme Court addressed this issue again in *Lane v. Franks*, stating "the critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of the employee's duties, not whether it merely concerns those duties." 573 U.S. 228, 240 (2014). In *Garcetti*, the Supreme Court declined to delineate a bright line rule on citizen speech, but rather explained:

> The proper inquiry is a practical one. Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes.

*Id.* at 424-25. The Third Circuit has broken down this practical inquiry into four factors:

> (1) whether the speech of the employee relates to "special knowledge or experience acquired through the job," *see Gorum*, 561 F.3d at 185 (citing *Foraker v. Chaffinch*, 501 F.3d 231, 240 (3d Cir. 2007) *abrogated on other grounds by Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379 (2011); (2) whether the employee raises complaints or concerns about issues relating to their job duties up the chain of command at their workplace, *Foraker*, 501 F.3d at 241; (3) whether the speech falls within the employee's designated responsibilities, *Gorum*, 561 F.3d at 186; and (4) whether the employee's speech is in furtherance of his designated duties, even if the speech at issue is not part of them. *See Foraker*, 501 F.3d at 243.

*Kimmett v. Corbett*, 554 Fed. Appx. 106, 111 (3d Cir. 2014).  In their motion to dismiss, Defendants argue that Plaintiffs' speech consisted only of complaints up the chain of command regarding operation and management of the 911 Call Center.  In response, Plaintiffs acknowledge these complaints were made up the chain of command, but state they were also made to members of other agencies and organizations, and members of the public.  Plaintiffs also allege they complained openly about the 911 Call Center.  All seven Plaintiffs have alleged a First Amendment retaliation claim.  We will address each Plaintiff's claim of purported citizen speech pleaded in the Amended Complaint.

Plaintiffs all allege they complained to unidentified county supervisors about the discrimination of Alvarez-Carril and the racially hostile working environment of the 911 Call Center.  Amend. Compl. at ¶¶ 40-87.  Zucal also pleads that from July 2019 through July 2020, he spoke regularly with members of the Allentown Police Department and the Woodlawn and Allentown Fire Departments regarding the policies, training and management of the 911 Call Center.  *Id.* at ¶¶ 123-25, 133-38.  Zucal's complaints to County supervisors over this same period included issues with the city's radio system, *id.* at ¶¶ 126-27, delays in responses to fire calls and resulting safety risks, *id.* at ¶ 138, operation of the CAD system and improper use by dispatchers, *id.* at ¶¶ 143-44, dispatchers' failure or refusal to run license plate checks, *id.* at ¶ 145, and complaints about the workplace behavior of defendants Gieringer, Kalynych, and another co-worker.  *Id.* at ¶¶ 142-44, 150-53.

Between July 2019 and January 2020, Plaintiff Francis C. Gatens spoke regularly with members of the Slatington, Salisbury, and Whitehall Police Departments about the lack of training of 911 dispatchers and the ensuing delays in response times.  *Id.* at ¶ 155.  His complaints to county supervisors included issues with the CAD system, the workplace behavior

of fellow employees which included allegations of a co-worker sleeping on the job and using a personal device that distracted other dispatchers, and dispatchers' failure to conduct license plate checks. *Id.* at ¶¶ 156-59. Some of his other complaints included issues with the digital radio system, lack of proper training which resulted in erroneous dispatches, and dispatchers failing to answer their phones and using their own personal devices at work. *Id.* at ¶ 157.

Plaintiff Kirchner pleads that in 2019 he was involved in conversations with members of the Lehigh County Chief's Association, EMS Dispatch and several police officers regarding issues with the 911 Call Center. *Id.* at ¶ 160. His complaints to county supervisors involved issues with radio calls involving fire emergencies, including calls not being recorded, radio not being monitored, and poor radio reception. *Id.* at ¶ 161. Some of his other complaints included dispatchers failing to respond to calls because they were using their personal devices, playing games or watching videos, and that due to a lack of safety, supervision and discipline policies the dispatchers continued to violate their job responsibilities. *Id.* at ¶¶ 161-64.

During that same period Plaintiff Geiger spoke with members of the Slatington Police Department, Northampton Regional Emergency Medical Services, and the Greenawalds Fire Department about issues concerning the lack of proper training for 911 dispatchers. *Id.* at ¶¶ 165-66. Her complaints to county supervisors included issues with the digital radio system, the CAD system, the workplace behavior of fellow 911 dispatchers and a lack of policies and supervision which all led to delays in response times. *Id.* at ¶¶ 167-71. During this same period Plaintiff Palmer made two complaints to county supervisors about the 911 phone system crashing during a conversation with an emergency caller. *Id.* at ¶ 172. Her other complaints included the lack of supervision of employees at the 911 Call Center, the workplace behavior of other dispatchers, and issues with the CAD system that led to delays. *Id.* at ¶ 176.

Plaintiff Landis's complaints to county supervisors included a lack of supervision of 911 dispatchers and issues involving dispatchers' processing of 911 calls. *Id.* at ¶¶ 177, 179. Landis also complained about an incident where dispatchers failed to document the existence of a gun in a domestic violence incident, *id.* at ¶ 177, difficulties and delays in handling 911 calls from Spanish speaking citizens, as well as a divisive atmosphere within the workplace. *Id.* at ¶ 179. Finally, Plaintiff David C. Gatens received these complaints from the other Plaintiffs and conveyed them to defendants Kalynych, Bailey, and other individuals over the same time period and at the townhall meetings held on August 26, 2019 and December 10, 2019. *Id.* at ¶¶ 185-97.

Plaintiffs claim these complaints are protected under the First Amendment because they involved matters of public concern. But Plaintiffs have failed to establish the first step in this analysis – that they were speaking as citizens and not as employees when making these complaints. *See Dougherty*, 772 F.3d at 987. Applying the framework set forth by the Third Circuit, Plaintiffs have failed to plead these complaints constitute "citizen speech." With respect to the first factor, the complaints cited in the Amended Complaint relate to Plaintiffs' "special knowledge" of the operations of the 911 Emergency Center obtained through their positions as 911 dispatchers. *See Gorum*, 561 F.3d at 185. These complaints, addressed mainly to county supervisors, concerned a variety of issues related to the operation and management of the 911 Emergency Center. Many of these complaints were based on firsthand observations. Plaintiffs claim their complaints resulted from their own observations and conversations with the public, which included members of related safety agencies, but did not involve their individual responsibilities as dispatchers. *See* Amend. Compl. at ¶¶ 302-03. The Court is not persuaded. While some of Plaintiffs' complaints may have originated from conversations with

members of the public and employees of other safety agencies, the vast majority of their complaints related to a lack of safety, supervision and training policies at the 911 Call center, the digital radio and CAD systems used by 911 dispatchers, and the workplace behavior of 911 dispatchers and supervisors.  Additionally, Plaintiffs' complaints regarding the treatment of Alvarez-Carril were based on their own observations of the alleged discrimination directed at her.  Practically speaking, these are matters that relate to Plaintiffs' "special knowledge" of the operations of 911 Emergency center and their "special experience" as 911 dispatchers.  *See Gorum*, 561 F.3d at 185.  Accordingly, this factor weighs against Plaintiffs' claim of citizen's speech.

The second factor in this analysis requires us to consider whether the employee has raised complaints or concerns associated with their job duties up the chain of command at their workplace.  *Foraker*, 501 F.3d at 241.  Complaints made by public employees up the chain of command fall within their official capacity if the complaints concern their duties in the workplace.  *Barnes v. Brown*, No. 16-CV-214, 2016 WL 5376023, at *6 (E.D. Pa. Sept. 26, 2016); *see Taylor v. Pawlowski*, 551 Fed.Appx. 31, 32 (3d Cir. 2013) ("[I]n making their voices heard up the chain of command, government employees speak pursuant to their duties as government employees." (internal quotation marks and citation omitted)); *Morris v. Philadelphia Hous. Auth.*, 487 Fed.Appx. 37, 39-40 (3d Cir. 2012).  The Third Circuit has distinguished, however, complaints or reports made outside the normal chain of command or established channels.  *Foraker*, 501 F.3d at 233-34, 243; *see Tayoun v. City of Pittston*, 39 F. Supp. 3d 572, 579 (M.D. Pa. 2014).  In *Tayoun*, the plaintiff, a police chief, reported illicit photographs he found on a police department computer to the Mayor, who was within his normal chain of command, and to the Pennsylvania Attorney General, an "unaffiliated entity"

13

outside his normal chain of command.  39 F. Supp. 3d 574, 579.  The Court found that because the Attorney General was an entity outside of his normal chain of command, plaintiff had "acted as a private citizen when reporting these issues independently to that office." *Id.* at 579 (citing *Davis v. McKinney*, 518 F.3d 304, 313 (5th Cir.2008) ("If however a public employee takes his job concerns to persons outside the work place [sic] in addition to raising them up the chain of command at his workplace, then those external communications are ordinarily not made as an employee, but as a citizen."); *Freitag v. Ayers*, 468 F.3d 528, 545 (9th Cir.2006) ("[A plaintiffs] right to complain both to an elected public official and to an independent state agency is guaranteed to any citizen in a democratic society regardless of his status as a public employee.")).

        As discussed above, Plaintiffs' purported citizen speech consisted of complaints that were associated with their job duties as 911 dispatchers, and these complaints were made primarily to county supervisors.  It should be noted that Plaintiffs have not identified the county supervisors to which most of these complaints were made, nor the dates or times these complaints were made.  Plaintiffs have pleaded they raised their complaints up the chain of command to supervisors and through the pipeline.  In their motion response, Plaintiffs claim their complaints were not only directed up the chain of command and through the pipeline, but that they also discussed their complaints with first responders, county residents, newspaper reporters and more.  However, Plaintiffs do not plead sufficient facts regarding these alleged complaints made to people outside their normal chain of command.  Plaintiffs' strongest argument here centers on the complaints made at the two Town Hall meetings that took place in 2019.  In both of those meetings, Plaintiff David M. Gatens relayed Plaintiffs' complaints to county supervisors and administrators who were present.  But Plaintiffs have not pleaded

14

sufficient factual allegations to establish these meetings involved anyone outside of their normal chain of command or were anything other than an office meeting between employees and their supervisors.  And unlike the plaintiff in *Tayoum*, Plaintiffs have failed to adequately plead their complaints were raised to any specific individuals outside their normal chain of command.  Instead, the factual allegations presented thus far establish the vast majority of Plaintiffs' complaints cited under this claim were complaints made to county supervisors about matters within the purview of their positions as 911 dispatchers.  Therefore, this factor weighs against a finding of citizen speech.

The last two factors are taken from the Third Circuit's decision in *Kimmett* – "whether the speech falls within the employee's designated responsibilities," and whether "the employee's speech is in furtherance of his designated duties, even if the speech at issue is not part of them." *Kimmett*, 554 Fed. Appx. at 111.  As discussed above, the complaints made by Plaintiffs concerned the day to day management and operation of the 911 Call Center, and from their pleadings it is evident these complaints were made in furtherance of Plaintiffs' duties and responsibilities as 911 dispatchers.  Accordingly, having considered these four factors, the Court finds that Plaintiffs' complaints that serve as the basis for their retaliation claim are not protected by the First Amendment as citizen speech.  And because the Plaintiffs' statements were made within their duties as government employees, the Court need not address whether their statements involved a matter of public concern or whether the government lacked "an 'adequate justification' for treating the employee differently than the general public based on its needs as an employer under the *Pickering* balancing test." *Dougherty*, 772 F.3d at 987 (quoting *Gorum*, 561 F.3d at 185).  Accordingly, Defendants' motion to dismiss this claim is granted.

### b.   Motion to Dismiss Fourteenth Amendment Due Process Claim

In Count Two of the Amended Complaint, Plaintiffs allege Defendants deprived them of their property interests in their good names and reputations by spreading defamatory, false and damaging statements regarding their terminations.  Plaintiffs also allege that they had a right to name-clearing hearings which was denied.

To state a 14th Amendment procedural due process claim, Plaintiffs must allege: "(1) [they were] deprived of an individual interest that is encompassed within the 14th Amendment's protection of 'life, liberty of property,' and (2) the procedures available to [Plaintiffs] did not provide [them] with 'due process of law.'" *Hill v. Borough of Kutztown*, 455 F.3d 225, 233-34 (3d Cir. 2006) (quoting *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000).  Because "[r]eputation alone is not an interest protected by the Due Process Clause[,]" *Versarge v. Twp. of Clinton, New Jersey*, 984 F.2d 1359, 1371 (3d Cir.1993) (quoting *Clark v. Twp. of Falls*, 890 F.2d 611, 619 (3d Cir. 1989), a plaintiff "must show a stigma to his reputation *plus* deprivation of some additional right or interest" to establish a due process claim for deprivation of a liberty interest in reputation.  *Hill*, 455 F.3d at 236 (citing *Paul v. Davis*, 424 U.S. 693, 701 (1976) (emphasis added).  This is referred to as a "stigma-plus" claim.  *Id*.  To make out the stigma portion of the claim, a plaintiff must allege that the purportedly stigmatizing statements were made publicly and were false.  *Id*.  The plus prong is generally met when someone is terminated from employment or denied a property interest.  *Graham v. City of Philadelphia*, 402 F.3d 139, 142, n.2 (3d Cir. 2005).

As to the stigma portion of this claim, we must first examine the substance of the purported stigmatizing statements, and whether they were public.  Plaintiffs claim that between January 1, 2020 and January 23, 2020, Defendants spread false and defamatory statements

regarding the Plaintiffs and their terminations through the media, workplace and pipeline of information throughout Lehigh County.  Amend. Compl. at ¶¶ 372-73.  However, Plaintiffs fail to identify the substance of these statements, the individuals who made these statements, and when or where these statements were made.  In their motion response, Plaintiffs contend that Defendants published accusations against them that "each Plaintiff had a drinking problem" and were "consuming alcoholic beverages at the 911 Center during work hours on December 31, 2019 without the employer's consent."  Pls. Resp. to Defs. Mot. to Dismiss, ECF No. 26 at 6, n.2.  Yet the only specific facts alleged in the amended complaint are that defendant Gieringer advised Molchany and the other Defendants that Plaintiffs had engaged in the New Year's toast, and during meetings with defendant Redding Plaintiffs learned that County supervisors were alleging they had drinking problems.  *See* Amend. Compl. at ¶¶ 232, 261.  These facts are insufficient to establish Defendants made false and defamatory statements, or that the statements were false.

    With respect to publication, Plaintiffs claim that statements within the context of a stigma plus claim are public when they are "likely to be disseminated widely enough to damage the discharged employee's standing in the community or foreclose future job opportunities." *Brandt v. Bd. Of Co-op. Educ. Servs., Third Supervisory Dist., Suffolk Cty., N.Y.*, 820 F.2d 41, 44 (2d Cir. 1987).  In *Brandt*, the plaintiff claimed that the "public" requirement of his deprivation of liberty interest claim was satisfied by the presence of sexual misconduct allegations in his personnel file.  *Id.*  Plaintiff argued that potential employers would "most certainly not hire him" once they learned of the charges.  *Id.*  The Second Circuit Court of Appeals held that if the plaintiff "is able to show that prospective employers are likely to gain access to his personnel file and decide not to hire him, then the presence of the charges in his

file has a damaging effect on his future job opportunities." *Id.* at 45.  But here in the Third

Circuit, the presence of stigmatizing information in a personnel file, on its own, does not satisfy

the publication prong of the stigma test.  *Cooley v. Pa. Hous. Fin. Agency*, 830 F.2d 469, 470

(3d Cir.1987), *abrogated on other grounds by Foster v. Chesapeake Ins. Co.*, 933 F.2d 1207 (3d

Cir.1991); *Copeland v. Philadelphia Police Dep't*, 840 F.2d 1139, 1148 (3d Cir. 1988); *see*

*Kocher v. Larksville Borough*, 926 F.Supp.2d 579, 603 (M.D. Pa.), *aff'd*, 548 F. App'x 813 (3d

Cir. 2013).  It should be noted that Plaintiffs have not made any allegations regarding the

presence of stigmatizing information within their personnel files.  But nonetheless, Plaintiffs

have failed to plead sufficient facts giving rise to a plausible inference that any stigmatizing

statements were public, let alone made by Defendants.  The absence of this information is also

critical to the question of whether the statements were false.  Because Plaintiffs have failed to

identify the substance of the purported stigmatizing statements, Plaintiffs cannot establish that

the statements were false.  The Court need not address the plus prong of this test, as Plaintiffs

are unable to sufficiently plead the stigma element at this time.

1. Name clearing hearing

Plaintiffs claim they were entitled to a name clearing hearing but chose not to pursue it

based on false promises from supervisors.  Amend. Compl. at ¶¶ 377-78.  In an action alleging a

stigma plus claim, "'the principal relief' for the 'stigma' is a name-clearing hearing." *Otto v.*

*Williams*, 704 Fed.Appx. 50, 53 (3d Cir. 2017) (quoting *Ersek v. Twp. of Springfield*, 102 F.3d

79, 84 (3d Cir. 1996)).  Even accepting Plaintiffs' allegations as true, which is required at this

stage, they still cannot establish they were entitled to a name-clearing hearing because they

cannot sufficiently plead a stigma plus claim at this time.  Defendants contend that Plaintiffs are

not entitled to a name clearing hearing because one is not required.  The Court disagrees.  As

the Third Circuit has repeatedly held, the principal remedy for a stigma plus violation is the name-clearing hearing. *See id.*; *Hill*, 455 F.3d at 236. Plaintiffs would be entitled to one if they pleaded sufficient factual allegations to establish their stigma plus claim.

### 2. Plaintiff's Purported Property Interest in their Positions as 911 Dispatchers

In their Amended Complaint, Plaintiffs aver that their positions as 911 dispatchers were fundamental property rights under the 14th Amendment that could not be deprived without due process of law. Amend. Compl. at ¶¶ 367-71. In Defendants' motion to dismiss and Plaintiffs' response, both parties address only the stigma plus claim. However, the Amended Complaint does contain allegations of a deprivation of Plaintiffs' fundamental property rights, those being their positions as 911 dispatchers. *See* Amend. Compl. at ¶¶ 362-68. The Court will address Plaintiffs' due process claim as it pertains to their purported property interest in their positions as 911 dispatchers..

"To have a property interest in a job … a person must have more than a unilateral expectation of continued employment; rather, she must have a legitimate entitlement to such continued employment." *Elmore v. Cleary*, 399 F.3d 279, 282 (3d Cir. 2005) (citing *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)). As a general rule, at-will employees do not have such an entitlement because they serve at the pleasure of their employers. *Id.* (citing *Chabal v. Reagan*, 841 F.2d 1216, 1223 (3d Cir.1988)). In Pennsylvania, public employees are considered at-will unless otherwise indicated by statute or contract. *Astine v. Adams*, No. 20-CV-02160, 2023 WL 1805204, at *3 (M.D. Pa. Feb. 7, 2023). In their Amended Complaint, Plaintiffs claim their employment was predicated on the statutory mandate that merged the 911 emergency centers of Allentown and Lehigh County, and their positions as 911 dispatchers are thus to be considered fundamental property rights. But Plaintiffs fail to cite any

statutory authority granting entitlement to their positions.  Instead, Plaintiffs state only that they received their positions through the Pennsylvania Emergency Management Agency as mandated under Title 35 of the Pennsylvania Consolidated Statutes.  Amend. Compl. at ¶¶ 297-99. Outside of this vague reference to a statute, Plaintiffs do not provide any specific statutory authority establishing their positions or granting any entitlement in these positions.   Plaintiffs also do not claim any entitlement from a contract in their Amended Complaint.  Accordingly, at this time, Plaintiffs have failed to establish they had a "legitimate entitlement to [their] continued employment" as 911 dispatchers.  *See Elmore*, 399 F.3d at 282.  Defendants' motion to dismiss Plaintiffs' procedural due process claim is granted.

### c.   Motion to Dismiss Hostile Work Environment Claims

Defendants move to dismiss Plaintiffs' hostile work environment claim under Title VII and 42 U.S.C. § 1983.  To succeed on a hostile work environment claim under Title VII, an employee must establish the following elements:

> (1) the employee suffered intentional discrimination because of membership in a protected class; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person in like circumstances; and (5) the existence of responsibility on the part of the employer.

*Felder v. Penn Mfg. Indus.*, 303 F.R.D. 241, 243 (E.D. Pa. 2014) (citing *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013)).  "The first four elements establish a hostile work environment, and the fifth element determines employer liability."  *Id.* (quoting *Mandel*, 706 F.3d at 167).  As to the first element, in determining whether harassment is based on sex, the Supreme Court has stated "[t]he critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)

(quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 25 (1993) (Ginsburg, J., concurring)).  When considering the first element, the Third Circuit has noted "the intent to discriminate on the basis of sex in cases involving sexual propositions, innuendo, pornographic materials, or sexual derogatory language is implicit, and thus should be recognized as a matter of course." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482 n.3 (3d Cir. 1990).

Here, the Plaintiffs brought this claim against all defendants.  In their motion to dismiss, Defendants' arguments focus on the alleged discrimination of Alvarez-Carril and Palmer.  In their response, Plaintiffs claim their Amended Complaint avers sufficient facts to establish Defendants had "an official policy or custom of nonfeasance, condonation and/or deliberate indifference to sexual harassment in the [911 Call Center]" and the existence of a sexually hostile work environment with respect to Plaintiff Palmer.  *See* Pls. Resp. to Defs. Mot. to Dismiss, ECF No. 26 at 8-9.  Plaintiffs' Title VII claim in the Amended Complaint, however, does not allege any factual allegations related to a policy or custom, or to the alleged discrimination of Palmer.  Instead, it alleges Plaintiffs suffered discrimination as a result of their opposition to violations of Title VII, and then suffered adverse employment actions undertaken by Defendants to dissuade others from making or supporting a claim under Title VII.  Amend. Compl. at ¶¶ 388-91.  While these allegations fail to establish a hostile work environment claim under Title VII, the Court will address the parties' arguments as they pertain to Alvarez-Carril and Plaintiff Palmer.

Plaintiffs allege that unidentified county supervisors subjected Alvarez-Carril to discrimination, and as a result the 911 Emergency Call Center became a racially hostile work environment.  *Id.* at ¶¶ 45, 59, 63, 71, 77, 80, 87, 108, 110, 117.  However, Alvarez-Carril is not a party to this action.  And the Third Circuit has held that a plaintiff cannot meet the first element of a Title VII Hostile Work Environment claim based solely on comments directed at other

individuals.  *Caver v. City of Trenton*, 420 F.3d 243, 263 (3d Cir. 2005).  While the Court finds the allegations of discrimination against Alvarez-Carril troubling, "this evidence is insufficient without more to establish a hostile work environment."  *Id.*

Plaintiff Palmer is the only plaintiff who has alleged she was personally subjected to sexual harassment.  She alleges she was criticized by an unidentified male employee for taking breaks to pump breast milk, *see* ¶ 90; she was subjected to comments from unidentified supervisors about breast milk, *see* ¶¶ 91-93; she was harassed and inappropriately touched by an unidentified male co-worker, who also printed a photo of Palmer and placed it on a binder, *see* ¶¶ 93-94; and was subjected to inappropriate and harassing comments by unidentified co-employees for sitting next to another unidentified employee, *see* ¶¶ 99-100.  Palmer fails, however, to identify the parties who committed the harassment and when or where the harassment took place, nor does she identify the county supervisors to whom she complained or when these complaints were made.  Moreover, Palmer does not allege she suffered the discrimination because of her membership in a protected class.  Therefore, her claim would fail at this stage even if these allegations were made under Plaintiffs' hostile work environment claim.

Assuming, *arguendo*, that Palmer was able to satisfy the first element of her Title VII claim, she would not be able to establish the second element, wherein a plaintiff must show the alleged harassment was "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment."  *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986).  To determine whether alleged harassment was severe or pervasive, we must consider a variety of factors, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Harris*, 510 U.S. at

23; *see Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 205 (3d Cir. 2001).  The alleged conduct must "go beyond 'simple teasing, offhand comments, and [non-serious] isolated incidents,' which would 'not amount to discriminatory changes in the terms and conditions of employment.'" *Abramson v. William Paterson Coll. of N.J.,* 260 F.3d 265, 280 (3d Cir.2001) (quoting *Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1988).

As discussed above, Palmer is the only plaintiff who has alleged she was personally subjected to sexual harassment.  And she is unable to show that the harassment she experienced was severe and pervasive because she has provided only scant details regarding these allegations. The lack of details here prevents the Court from considering the frequency of the harassment, whether it was severe or physically threatening or humiliating, or whether it unreasonably interfered with Palmer's job performance.  *See Harris*, 510 U.S. at 23.  Plaintiffs at this time have therefore failed to plead sufficient factual allegations to establish the alleged harassment was severe and pervasive.

We are sensitive that "[c]ourts have been hesitant to dismiss hostile work environment claims under Rule 12(b)(6) because the proof of this claim is highly fact-specific."  *Garrett v. U.S. Dep't of Veterans Affs.*, No. 05-CV-1164, 2007 WL 1875535, at *7 (D.N.J. June 28, 2007) (citations omitted).  But absent nonconclusory allegations concerning whether Plaintiffs have suffered intentional discrimination because of membership in a protected class or that the discrimination was severe or pervasive, we cannot let these claims proceed.  Nevertheless, Plaintiffs will be given leave to amend because it is plausible they could state a hostile work environment claim.

### d. Motion to Dismiss *Monell* Claim

Section 1983 liability does not attach to a municipality based on theories of *respondeat superior* or vicarious liability.  *McCall v. City of Phila.*, 396 F. Supp. 3d 549, 558–59 (E.D. Pa. 2019) (citing *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)).  Instead, a plaintiff must "establish a causal connection between the [constitutional] violation and the municipality's policy or custom."  *Valenzuela v. Roselle*, No. 5:20-cv-03638-JMG, 2021 WL 1667473, at *4 (E.D. Pa. Apr. 28, 2021) (citing *Johnson v. City of Phila.*, 975 F.3d 394, 403 (3d Cir. 2020)).  An underlying constitutional violation is required for a plaintiff to prevail on a *Monell* claim. *Mulholland v. Gov't Cnty. of Berks, Pa.*, 706 F.3d 227, 238, n.15 (3d Cir. 2013) ("It is well-settled that, if there is no violation in the first place, there can be no derivative municipal claim); *see Grant v. City of Philadelphia*, No. 20-CV-735, 2022 WL 11615669, at *19 (E.D. Pa. Oct. 20, 2022).

There are two ways to proceed with a § 1983 claim against a municipality.  *See Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019).  First, "[a] plaintiff may put forth that an unconstitutional policy or custom of the municipality led to his or her injuries."  *Id.* (citing *Estate of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019)).  Alternatively, a plaintiff may allege that his or her injuries "were caused by a failure or inadequacy by the municipality that reflects a deliberate or conscious choice."  *Id.* (internal quotation marks and citation omitted).

A plaintiff alleging an unconstitutional policy must "point to an official proclamation, policy or edict by a decisionmaker possessing final authority to establish municipal policy on the relevant subject."  *Id.*  To show an unconstitutional custom, a plaintiff "must evince a course of conduct so well-settled and permanent as to virtually constitute law."  *Id.* at 106 (internal citation omitted).

By contrast, a plaintiff bringing a "failure or inadequacy" claim must demonstrate that the "failure or inadequacy amount[ed] to deliberate indifference on the part of the municipality." *Id.* (internal citation omitted). Deliberate indifference is found where "(1) municipal policymakers know that employees will confront a particular situation, (2) the situation involves a difficult choice or a history of employees mishandling, and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Id.* (citing *Carter v. City of Phila.*, 181 F.3d 339, 357 (3d Cir. 1999)). "'[A] pattern of similar constitutional violations by untrained employees" is ordinarily necessary to demonstrate deliberate indifference, but a single incident may, in certain situations, be sufficient. *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 223 (3d Cir. 2014) (internal quotation marks and citation omitted). In these "single-incident cases," the "need for training can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." *Id.* (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 n.10 (1989)); *see also id.* at 223–24 ("Liability in single-incident cases depends on [t]he likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights." (internal quotation marks and citation omitted)).

Here, as discussed above, Plaintiffs have thus far failed to plead sufficient factual allegations to establish an underlying constitutional violation. Accordingly, their *Monell* claim fails. Even if they did make out an underlying constitutional violation, however, their Amended Complaint still fails to allege a policy or custom that led to any injuries, or that any "failure or inadequacy amount[ed] to deliberate indifference on the part of [defendant Lehigh County]." *See Forrest*, 930 F.3d at 106. Plaintiffs allege, *inter alia*, that Defendant Lehigh County, through "its policymakers, decisionmakers and supervisory/management level employees," violated their

25

constitutional rights while "[a]cting pursuant to a custom to retaliate against Plaintiffs for their

First Amendment protected activity." Amend. Compl. ¶ 396. Plaintiffs further allege that official

policies and customs of Defendant Lehigh County resulted in the violation of their rights under

the First and Fourteenth Amendments. *Id.* at ¶¶ 397-99. Plaintiffs' conclusory allegations fail to

establish their *Monell* claim against Defendant Lehigh County. Indeed, Plaintiffs have not

pointed to any specific municipal policy that led to their alleged injuries. "Conclusory and general

claims that paraphrase [section] 1983 will not satisfy federal pleading requirements," yet that is

all Plaintiffs allege in their amended pleading. *McCall*, 396 F. Supp.3d at 559 (citing *Wood v.*

*Williams*, 568 F. App'x 100, 104 (3d Cir. 2014)); *see also Walker v. N. Wales Borough*, 395 F.

Supp.2d 219, 226 (E.D. Pa. 2005) (dismissing section 1983 claim where plaintiff failed to plead

"any factual allegations . . . [referencing] any official municipal policy or custom endorsing the .

. . Defendants' conduct"); *Washington v. City of Phila.*, No. 11-CV-3275, 2012 WL 85480, at *8

(E.D. Pa. Jan. 11, 2012) (dismissing section 1983 claim where plaintiff's "description of the

policy or custom falls far short of a 'specif[ication of] what exactly that custom or policy was,'

as our Court of Appeals requires" (quoting *McTernan v. City of York, Pa.*, 564 F.3d 636, 658 (3d

Cir. 2009)).

      Plaintiffs' attempt at pleading a "failure or inadequacy" claim also falls short. Plaintiffs

allege, *inter alia*, that Defendant Lehigh County "developed or maintained policies or customs

exhibiting deliberate indifference to the constitutional rights of individuals and employees…and

to unjust, unlawful and retaliatory practices by its policymakers, decisionmakers and

supervisory/management level employees wherein individuals…were retaliated against for

exercising their First Amendment right[s]." Amend. Compl. at ¶¶ 400-01. Plaintiffs further

allege that Lehigh County "maintained inadequate and defective policies, customs and practices

26

in the hiring, training and screening of its [employees]," and failed to institute policies to prevent constitutional violations and or misconduct.  *Id.* at ¶¶ 403-05.  Finally, Plaintiffs allege that Lehigh County "adopted, participated in, condoned and acquiesced" to the alleged wrongful conduct of Defendants Armstrong, Hozza, Redding, Molchany, Kalynych, Bailey and Gieringer, which demonstrated a deliberate indifference to the constitutional rights of Plaintiffs.  *Id.* at ¶¶ 406-10. Plaintiffs' *Monell* claim is filled with conclusory allegations that do not include any facts suggesting deliberate indifference.  Plaintiffs "omi[t] any reference from which we could reasonably conclude that others have suffered from a pattern of similar constitutional violations." *Washington*, 2012 WL 85480, at *8 (internal quotation marks omitted).  And because Plaintiffs "alleg[e] no facts for the Court to infer that [their] injury was a 'highly predictable consequence of the municipality's failure to train and supervise its [employees],'" they have not stated a cognizable "single-incident claim" either.  *Ferrara v. Del. Cnty.*, No. 18-cv-05157, 2019 WL 2568117, at *8 (E.D. Pa. June 21, 2019) (quoting *Thomas*, 749 F.3d at 225).  In sum, Plaintiffs' *Monell* claim against Lehigh County must be dismissed, as they have failed to establish an underlying constitutional violation or plead a claim for municipal liability.

### e.  Motion to Dismiss Civil Conspiracy Claim

Plaintiffs have alleged a 1983 Conspiracy claim against defendants Redding, Molchany, Kalynych, Bailey and Gieringer.  "In order to state a claim for conspiracy under section 1983, a plaintiff must establish (1) the existence of a conspiracy involving state action; and (2) a deprivation of civil rights in furtherance of the conspiracy by a party to the conspiracy." *Rosembert v. Borough of E. Lansdowne*, 14 F. Supp.3d 631, 647 (E.D. Pa. 2014) (internal quotation marks and citation omitted); *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 293–94 (3d Cir. 2018) ("To prevail on a conspiracy claim under § 1983, a plaintiff must prove that persons

acting under color of state law 'reached an understanding' to deprive him of his constitutional rights." (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970)).  To that end, Plaintiffs must allege plausible facts concerning "(1) the period of the conspiracy; (2) the object of the conspiracy; and (3) certain actions of the alleged conspirators taken to achieve that purpose." *Hankin Fam. P'ship v. Upper Merion Twp.*, No. 01-CV-1622, 2012 WL 43599, at *17 (E.D. Pa. Jan. 6, 2012) (internal quotation marks and citation omitted); *see also Rosembert*, 14 F. Supp. 3d at 648 ("To withstand a motion to dismiss, a complaint alleging a civil rights conspiracy should identify with particularity the conduct violating plaintiffs' rights, the time and place of these actions, and the people responsible therefor." (internal quotation marks and citation omitted)).

With respect to the deprivation of Plaintiffs' rights, as discussed above, Plaintiffs have thus far failed to establish any violation of their constitutional rights.  Therefore their § 1983 conspiracy claim fails.  Yet even if they had pleaded sufficient factual allegations to support an underlying constitutional violation, their claim would still fail.  In their Amended Complaint, Plaintiffs plead that defendants Redding, Molchany, Kalynych, Bailey and Gieringer conspired with each other to deny Plaintiffs of their First and Fourteenth Amendment rights by entering into an agreement to impose discipline on Plaintiffs in retaliation for Plaintiffs' purported "citizen speech."  Amend. Compl. at ¶¶ 412-14.  Plaintiffs allege the agreement was entered into some time after January 1, 2020, when defendant Gieringer informed co-defendants Redding, Molchany, Kalynych and Bailey of the Plaintiffs' New Year's toast.  *Id.* at ¶ 415.  Plaintiffs claim defendants Redding, Molchany, Kalynuch, Bailey and Gieringer acted in furtherance of this conspiracy in scheduling "fact-finding proceedings" wherein Plaintiffs' positions were terminated or they resigned.  *Id.* at ¶ 417.

These conclusory allegations do not pass muster.  *See Rosembert*, 14 F. Supp. 3d at 647.  While Plaintiffs present a time frame and an object of the alleged conspiracy, they have failed to plead any specific allegations as to the actions taken in furtherance of the conspiracy by the named Defendants.  Plaintiffs' claims therefore do not "[s]upport a reasonable inference that defendants reached an agreement or a meeting of the minds concerning their alleged violations of plaintiff's rights."  *Chan v. Cnty. of Lancaster*, No. 10-cv-03424, 2012 WL 4510776, at *1 (E.D. Pa. Sept. 28, 2012); *see Cooper v. City of Chester*, No. 11-CV-5381, 2011 WL 6046934, at *8 (E.D. Pa. Dec. 5, 2011).  Accordingly, even if they had established an underlying constitutional violation, Plaintiffs' section 1983 conspiracy claim would still be dismissed.  *See, e.g.*, *Villarosa v. N. Coventry Twp.*, No. 15-CV-4975, 2016 WL 4062731, at *10 (E.D. Pa. July 28, 2016) ("Plaintiff merely *speculates* that . . . a scheme existed.  This is insufficient to survive a motion to dismiss . . . ." (emphasis added)).

### f.   Motion to Dismiss Supervisory Liability Claim

Plaintiffs have alleged a § 1983 supervisory liability claim against defendants Armstrong and Hozza in their capacity as supervisors and managers.  The Third Circuit recognizes two theories of supervisory liability.  *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juv. Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004).  Under the first theory, "individual defendants who are policymakers may be liable under § 1983 if it is shown that such defendants, 'with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm.'"  *Id.* (quoting *Stoneking v. Bradford Area Sch. Dist.,* 882 F.2d 720, 725 (3d Cir.1989)).  Here, the plaintiff "must identify the supervisor's specific acts or omissions demonstrating the supervisor's deliberate indifference to the [plaintiff's] risk of injury and must establish a link between the supervisor, the act, and the injury." *Chavarriaga v. N.J. Dep't of*

*Corr.*, 806 F.3d 210, 227 (3d Cir. 2015).   As to the second theory, "a supervisor may be personally liable under § 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in the subordinate's unconstitutional conduct." *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 316 (3d Cir. 2014), *reversed on other grounds by Taylor v. Barkes*, 575 U.S. 822 (2015) (citation omitted); *see Santiago v. Warminster Township*, 629 F.3d 121, 130 (3d Cir. 2010) ("[A]ny claim that supervisors directed others to violate constitutional rights necessarily includes as an element an actual violation at the hands of subordinates.").

Here, Plaintiffs' supervisory liability claim fails for the same reason their *Monell* claim fails – Plaintiffs have not pled sufficient factual allegations to establish any underlying constitutional violation.  Even if they did make out an underlying constitutional violation, their Amended Complaint fails to include any factual allegations describing Armstrong and Hozza's personal involvement in the events or conditions that give rise to their claims.  Moreover, while Plaintiffs allege that Defendants Armstrong and Hozza were the County Executive and Administrator, respectively, the Amended Complaint does not contain sufficient facts to show that Armstrong and Hozza established or maintained a policy that resulted in their injuries, or that they directed or had knowledge of the conduct of others who may have violated Plaintiffs' rights. Plaintiffs allege Armstrong and Hozza knew or should have known that defendants Redding, Molchany, Kalynych, Bailey, and Gieringer violated Plaintiffs' rights.  Plaintiffs also allege that Armstrong and Hozza knew or should have known about prior instances of possession and use of alcohol on county property during work hours and knew or should have known that Alvarez-Carril was given permission to have the New Year's Toast.  Outside of these conclusory allegations, Plaintiff pleads no facts to show Armstrong or Hozza had any knowledge or

acquiesced to the conduct of the other Defendants.  Accordingly, these factual allegations are insufficient to support a Supervisory Liability claim against Armstrong and Hozza.  Plaintiffs' Supervisory Liability claim is therefore dismissed.

### g.  Leave to Amend

Third Circuit precedent "supports the notion that in civil rights cases district courts must offer amendment—irrespective of whether it is requested—when dismissing a case for failure to state a claim unless doing so would be inequitable or futile." *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 251 (3d Cir. 2007).   We therefore dismiss Plaintiffs' claims without prejudice, and will permit Plaintiffs to file a curative amendment.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' motion is **GRANTED**.  An appropriate order follows.[3]

BY THE COURT:

*/s/ John M. Gallagher*
JOHN M. GALLAGHER
United States District Court Judge

---

[3] As Defendants' motion to dismiss is granted, their Motion to Strike will be denied as moot.