**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JUSTIN K. ZUCAL, *et al.*, | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Civil No. 5:21-cv-04598-JMG |
| | : | |
| COUNTY OF LEHIGH, *et al.*, | : | |
| Defendants. | : | |

**MEMORANDUM OPINION**

**GALLAGHER, J.**                                                    **June 14, 2023**

Plaintiffs have filed a second amended complaint against Defendants Lehigh County; Philip Armstrong, County Executive ("Armstrong"); Edward Hozza, Jr., County Administrator ("Hozza"); Marc Redding, Director of Human Resources ("Redding"); Richard D. Molchany, Director of General Services ("Molchany"); John Kalynych, Former Director of Emergency Services ("Kalynych"); Laurie Bailey, Former Director of Emergency Services ("Bailey"); and Christine Gieringer, 9-1-1 Supervisor ("Gieringer"), alleging claims of First Amendment Retaliation, violations of Procedural Due Process and Title VII, and civil conspiracy. Plaintiffs have also brought a *Monell* claim and Supervisory Liability claims, as well as a state law claim for Intentional Infliction of Emotion Distress.

This Court previously granted Defendants' motion to dismiss Plaintiffs' Amended Complaint but afforded Plaintiffs leave to amend. Plaintiffs have since filed their second amended complaint, and Defendants again move to dismiss. Defendants have also moved to strike portions of the Second Amended Complaint. For the reasons explained below, the motion to dismiss will be granted in part and denied in part, and the motion to strike will be denied.

## I.    ALLEGATIONS[1]

In January 2019, the Allentown 911 Emergency Call Center ("Allentown 911 Call Center") merged with the Lehigh County 911 Emergency Call Center ("911 Call Center"). Second Amended Complaint, ECF No. 37 (SAC) at ¶ 23.  Prior to the merger, plaintiffs Justin K. Zucal ("Zucal") and David M. Gatens worked as 911 dispatchers in the Allentown 911 Call Center while plaintiffs Francis C. Gatens, John S. Kirchner ("Kirchner"), Emily M. Geiger ("Geiger"), Julie L. Landis ("Landis"), and Brandi L. DeLong Palmer ("Palmer") worked as 911 dispatchers at the Lehigh County 911 Call Center.  *Id.* at ¶ 22.

Between January 2019 and January 2020, Plaintiffs along with 911 Call Center supervisor Melissa Alvarez-Carril ("Alvarez-Carril") reported instances of wrongdoing that were occurring in the 911 Call Center both verbally and in writing through the County's Guardian Tracking database. *Id.* at ¶ 25.   These complaints and reports included allegations that Caucasian 911 dispatchers discriminated against non-English speaking 911 callers because of their race and/or ethnicity; issues with delays in processing 911 calls from Spanish-speaking callers; a sexually hostile work environment within the 911 Call Center; issues related to the Language Line Translation Service, including the failure to pay an invoice which led to a lapse in the service; the failure to staff the center with a sufficient number of Spanish speaking dispatchers; the failure to adopt and enforce safety policies; a failure to adequately train, supervise and discipline 911 Call Center dispatchers and supervisors with regard to discrimination and other workplace misconduct; the failure to rectify issues with the Computer Aided Dispatch ("CAD") system and software; and Defendants' reckless indifference and/or willful misconduct in ignoring Plaintiffs'

---

[1] On a motion to dismiss, we operate "on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

warnings regarding safety risks due to a lack of proper policies, training, supervision and discipline. *Id.* Plaintiffs allege these complaints were made to the Defendants, first-responders, and members of the public. *Id.*

From July 2019 through January 2020, Zucal had discussions with members of the Woodlawn Fire Department regarding the problems described above that were affecting the 911 Call Center. *Id.* at ¶ 40. He also raised these concerns with members of the Allentown Fire and Police Departments while speaking over the CAD system. *Id.* at ¶¶ 41-47. Following these communications, defendant Bailey and Operations Coordinator/Supervisor Dan Bellesfield sent an email to 911 dispatchers and supervisors stating that such use of the CAD system was prohibited. *Id.* at ¶ 48. Zucal attended a social gathering at the home of a Woodlawn firefighter in late summer of 2019, where he discussed his concerns about the 911 Call Center to others who were in attendance. *Id.* at ¶ 50. Zucal avers that this information was ultimately disseminated to the media and contributed to an article in the Morning Call newspaper dated January 12, 2020, which discussed delays in response times. *Id.* at ¶ 51.

During this same time period, Plaintiff Palmer raised similar concerns through the Guardian Tracker database and the informational pipeline to County supervisors and other individuals outside her chain of command. *Id.* at ¶ 57. She also discussed these concerns with her brother, who was an EMS volunteer, and other family members. *Id.* at ¶ 58. Additionally, she made other complaints to supervisors regarding issues with the 911 phone system, a lack of supervision of employees, the workplace behavior of other dispatchers, and issues with the CAD system that led to delays. *Id.* at ¶¶ 60-61.

Between July 2019 and January 2020, Francis C. Gatens made similar complaints to members of the Slatington, Salisbury Township and South Whitehall Police Departments

regarding the issues described above. *Id.* at ¶¶ 78-79. Plaintiff Geiger spoke to members of the Slatington Police Department, Northampton Regional Emergency Medical Services and the Greenawalds Fire Department about the issues described above. *Id.* at ¶¶ 81-82. Plaintiff Landis complained about these issues during the same period to an Allentown police officer and another individual. *Id.* at ¶ 83. Geiger and Landis also complained openly that the County would not allow them to serve as acting supervisors to train new hires due to their gender. *Id.* at ¶ 84.

Between July 2019 and January 2020, Kirchner discussed the above-described issues with members of the Lehigh County Fire Chiefs Association, EMS dispatchers and numerous police officers. *Id.* at ¶ 87. He also complained to co-workers, supervisors, Defendants and people outside his chain of command about the operation of radio systems during fire emergencies, the workplace behavior of fellow 911 dispatchers and lack of policies and supervision which all led to delays in response times. *Id.* at ¶¶ 89-92. Plaintiff David C. Gatens, made similar complaints to co-workers, supervisors, Defendants, and people outside his chain of command. *Id.* at ¶ 93.

Both Kirchner and David M. Gatens, along with Alvarez-Carril, served as authorized representatives for the Plaintiffs at two Townhall meetings that took place on August 26, 2019 and December 10, 2019. *Id.* at ¶¶ 87, 100. These meetings were open to the public. *Id.* at ¶ 99. The August 26th meeting was attended by Bailey, Gieringer, Kalynych and others within Plaintiffs' chain of command, we well as an Assistant Chief of Police, a Police Captain, and the Allentown EMS Chief. *Id.* at ¶ 100. Plaintiffs David C. Gatens, Kirchner, along with Alvarez-Carril, described the issues affecting the 911 Call Center, which included racial discrimination, a hostile work environment, and a lack of proper training, diversity, supervision and discipline, and called for immediate changes to remedy these issues. *Id.* at ¶ 101. They warned those in attendance that failure to address these issues created a serious risk of death or bodily harm to

members of the community, particularly minorities. *Id.* at ¶ 103. During this meeting defendant Bailey stated the recommended changes would not be implemented and "conveyed the message" that "it's our way or the highway." *Id.* at ¶ 104.

On December 31, 2019, ten 911 dispatchers shared a New Year's Eve toast over small cups of eggnog. *Id.* at ¶ 132. Plaintiffs claim that Gieringer and Kalynych had knowledge of and consented to the toast, and, that Kalynych specifically granted permission to Alvarez-Carril to have the toast. *Id.* at ¶¶ 132, 137. Plaintiffs also claim that prior to the toast, they had observed supervisors and other Lehigh County employees use, possess, or distribute alcohol on county property without any discipline. *Id.* at 136.

On January 12, 2020, the Morning Call newspaper published an article titled "Lehigh County 9-1-1 Calls Taking Longer to Dispatch Since Merger of Allentown, County Centers." *Id.* at ¶ 111. Plaintiffs contend their complaints were reflected in the article. *Id.* at ¶ 113. Defendant Molchany made several comments in the article. *Id.* at ¶¶ 118-20. Following publication, each Plaintiff openly took issue with Molchany's comments in the article. *Id.* at ¶ 121. Defendants, particularly Molchany, were infuriated by Plaintiffs' repudiation of the article. *Id.* at ¶ 127.

On January 15, 2020, defendant Redding met with Plaintiffs Zucal, Francis C. Gatens, Geiger, Landis and Palmer for what Redding called a "fact finding process." *Id.* at ¶ 141. On January 21, 2020, they were ordered to attend individual meetings with Redding the next day. *Id.* at ¶ 143. During their subsequent meetings with Redding, these Plaintiffs learned that county supervisors were alleging they had "drinking problems." *Id.* at ¶ 144. During these meetings these Plaintiffs were told their positions were being terminated and they were given an opportunity to resign. *Id.* at ¶ 145. These plaintiffs claim Redding told them they could reapply for their positions, and that resignation would look better than termination. *Id.* at ¶¶ 146-148. In

reliance of Redding's representations, these Plaintiffs wrote a resignation letter and immediately applied for reinstatement.  *Id.* at ¶ 150.  Plaintiffs claim the applications for reinstatement were ignored and dismissed.  *Id.* at ¶ 151.

Alvarez-Carril and Plaintiffs David M. Gatens and Kirchner also met with Redding on January 15, 2020.  Id. at ¶ 152.  On January 21, 2020 they were ordered to attend individual meetings with Redding.  Id. at ¶ 154.  During their subsequent meetings with Redding, Plaintiffs David M. Gatens and Kirchner were informed their employment was being terminated and were subsequently escorted from the premises.  *Id*. at ¶¶ 156-57.  Defendants' sole reason for the resignations and termination of these two Plaintiffs was their participation in the New Year's toast and the consumption of alcohol.  *Id.* at ¶ 158.  Alvarez-Carril was also terminated the same day for the same reason.  *Id.* at ¶ 159.

Finally, Palmer has also made several troubling allegations of sexual harassment.  These allegations include inappropriate comments from male co-workers as well as female supervisor Christine Buskaritz ("Buskaritz") regarding Palmer's taking breaks at work to pump breastmilk. *Id.* at ¶ 66(a-b).  Palmer has also made several allegations regarding co-worker Scott Rabenold ("Rabenold"), whom she has accused of making inappropriate comments, inappropriately touching her without permission, and printing a photograph of her and placing it on the cover of his work binder without her permission.  *Id.* at ¶ 66(c).  Palmer alleges Rabenold was attracted to her red hair, which compelled her to dye her hair another color.  *Id.*    Palmer also alleged she was harassed by Lori Harvey-Borso ("Harvey-Borso"), who told Palmer the only reason she was hired was because of her brother and because she is a woman, and Donald Smith ("Smith"), who told Palmer that women are not capable of doing the job as well as men, and played a recording of Palmer making a botched weather announcement for others.  *Id.* at ¶ 66(f).  Palmer alleges she

was subjected to this gender-based harassment at various points during her employment. *Id.* at ¶¶ 68, 74 and 76.

## II.    STANDARD

A complaint may be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "Although the plausibility standard does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal quotation marks and citations omitted). In other words, "there must be some showing sufficient to justify moving the case beyond the pleadings to the next stage of litigation." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234–35 (3d Cir. 2008).

Third Circuit courts deploy a three-step analysis when faced with motions to dismiss. First, we identify "the elements [the] plaintiff must plead to state a claim." *Connelly*, 809 F.3d at 787 (quoting *Iqbal*, 556 U.S. at 675). Next, we "identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* (quoting *Iqbal*, 556 U.S. at 679). Finally, we assume the veracity of well-pleaded factual allegations, "and then determine whether they plausibly give rise to an entitlement to relief." *Id.* (quoting *Iqbal*, 556 U.S. at 679). For purposes of this analysis, we "accept all factual allegations as true, [and] construe the complaint in the light most favorable to the plaintiff." *Warren Gen. Hosp. v. Amgen, Inc.*, 643

F.3d 77, 84 (3d Cir. 2011).

## III.   DISCUSSION

Plaintiffs have brought claims under 42 U.S.C. § 1983 against Defendants, alleging First Amendment Retaliation, a due process claim and a violation of Title VII.  Plaintiffs have also brought a civil conspiracy and *Monell* claim, as well as supervisory liability claims against Armstrong and Hozza.  To state a section 1983 claim, a plaintiff must show "a deprivation of a constitutional right and that the constitutional deprivation was caused by a person acting under the color of state law."  *Phillips*, 515 F.3d at 235 (internal citation omitted).  "The first step in evaluating a section 1983 claim is to 'identify the exact contours of the underlying right said to have been violated' and to [then] determine 'whether the plaintiff has alleged a deprivation of a constitutional right at all.'"  *Nicini v. Morra*, 212 F.3d 798, 806 (3d Cir. 2000) (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998)).  As the Supreme Court has stated, § 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 144, n.3 (1979).

### a.   Motion to Dismiss First Amendment Retaliation Claim

Plaintiffs have alleged their employment was terminated in retaliation for their complaints about the management and operation of the 911 Call Center, which included allegations of discriminatory behavior towards members of the community as well as a racially and sexually hostile work environment at the 911 Call Center.  Plaintiffs claim these complaints were not made pursuant to their positions as 911 dispatchers, but rather were made as private citizens out of concern for public safety of the community and were thus protected under the First Amendment as citizen speech.

The Court previously dismissed this claim, finding that Plaintiffs were speaking as employees and not as citizens when they made their complaints described in the Amended Complaint, as the complaints were related to the special knowledge or experience Plaintiffs had gained through their positions as 911 dispatchers, and, because the vast majority of the complaints described were made up the chain of command to supervisors and the Defendants. Plaintiffs again have brought a First Amendment Retaliation claim against all Defendants, alleging they lost their positions in retaliation for complaints made to individuals both within and outside their chain of command hierarchy.

Defendants move to dismiss, arguing Plaintiffs were speaking as employees and not citizens when making these complaints.  With respect to the purported complaints made up the chain of command, Defendants state that because these complaints involved their job duties, Plaintiffs would be expected "to report problems concerning the operations at the range up the chain of command." *See Foraker v. Chaffinch*, 501 F.3d 231, 241 (3d Cir. 2007) *abrogated on other grounds by Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379 (2011).  As to the individuals outside the Plaintiffs' chain of command, which included local first responders and members of the public, Defendants argue Plaintiffs were speaking as employees because these complaints related to "the conduct of business at their specialized workplace."  Def. Mot. to Dismiss SAC, ECF No. 39 at 10.

In their SAC, Plaintiffs allege they raised their concerns to individuals both within and outside their chain of command hierarchy.  This is an important distinction, as we "must conduct a particularized examination of each activity for which the protection of the First Amendment is claimed." *Johnson v. Lincoln Univ.*, 776 F.2d 443, 451 (3d Cir.1985).  We therefore distinguish between the complaints made to Defendants and other members within

Plaintiffs' chain of command hierarchy, and the alleged complaints made to individuals outside that chain, which include members of local police, fire and EMS departments, as well as members of the public.

### 1. Complaints up the Chain of Command

The Court dismissed this claim in its previous opinion, finding the vast majority of Plaintiffs' complaints regarding the 911 Call Center that were described in the Amended Complaint were raised to county supervisors and concerned the management and operation of the 911 Call Center. The Court found, therefore, that Plaintiffs were not speaking as citizens when making these complaints up the chain of command. *See Morris v. Philadelphia Housing Auth.*, 487 F. App'x 37, 29 (3d Cir. 2012) ("We have consistently held that complaints up the chain of command about issues related to an employee's workplace duties—for example, possible safety issues or misconduct by other employees—are within an employee's official duties."). But in addition to determining whether Plaintiffs raised complaints regarding their workplace duties and responsibilities up the chain of command, the Court must also consider whether Plaintiffs were expected to raise such complaints pursuant to their duties as 911 dispatchers and/or supervisors. *See Jerri v. Harran*, 625 F. App'x 574, 581 (3d Cir. 2015); *DeRitis v. McGarrigle*, 861 F.3d 444, 454 (3d Cir. 2017).

In *Jerri*, the Third Circuit found that some of a Fire Chief's statements were made as an employee, while others were made as a citizen. With respect to his complaints that were made directly to the defendants, who were Township officials, the Court found that he was speaking as an employee and not a citizen because "[o]ne of his job responsibilities as chief was to liaise with the Township on matters that concerned Union, and he did so when, for example, he 'complained to Defendants' about 'waste occurring on the part of Defendants with respect to a

non-functional fire training center." *Id.* at 580-81.  The Court stated that because the fire chief

"sought to bring Defendants' attention to alleged waste that harmed Union, he was doing what a

fire chief is meant to do, and thus he cannot be said to have acted in those contexts as a citizen."

*Id.* at 581.

In this case, Plaintiffs allege they made a range of complaints to Defendants and others

within their chain of command hierarchy, which included allegations that Caucasian 911

dispatchers discriminated against non-English speaking 911 callers because of their race and/or

ethnicity; issues with delays in processing 911 calls from Spanish-speaking callers; a sexually

hostile work environment within the 911 Call Center; issues related to the Language Line

Translation Service, including the failure to pay an invoice which led to a lapse in the service;

the failure to staff the center with a sufficient number of Spanish speaking dispatchers; the

failure to adopt and enforce safety policies; a failure to adequately train, supervise and

discipline 911 Call Center dispatchers and supervisors with regard to discrimination and other

workplace misconduct; the failure to rectify issues with the Computer Aided Dispatch ("CAD")

system and software; and Defendants' reckless indifference and/or willful misconduct in

ignoring Plaintiffs' warnings regarding safety risks due to a lack of proper policies, training,

supervision and discipline.  SAC at ¶ 25.   But absent from the complaint are allegations

Plaintiffs were obligated to bring these issues to the attention of Defendants and other

individuals within the chain of command.

In their SAC, Plaintiffs state their complaints constituted citizen speech that was not in

furtherance of their own duties as 9-1-1 dispatchers.  While Defendants argue Plaintiffs would

have been expected to make these complaints, the SAC contains no such allegation "[Plaintiffs

were] required, as part of [their] job, to make the statements [they claim] later became the basis

for Defendants' retaliation." *Bowers v. Univ. of Delaware*, No. CV 19-1883-LPS, 2020 WL 7025090, at *5 (D. Del. Nov. 30, 2020). And at this stage we are required to accept the factual allegations as true and must not make "factual findings as to the scope of [Plaintiffs'] duties." *Flora v. Cnty. of Luzerne*, 776 F.3d 169, 175-76 (3d Cir. 2015). Therefore, construing the SAC in the light most favorable to the Plaintiffs, the Court concludes that based on the factual allegations in the SAC Plaintiffs have plausibly alleged they were speaking as citizens when making their complaints to Defendants and others within their chain of command hierarchy. Defendants' contention that Plaintiffs would be expected to raise these complaints up the chain of command is "entirely plausible," and "arguably, it is more plausible than the contrary inference Plaintiff is asking be drawn from the allegations in the Amended Complaint. On a Rule 12(b)(6) motion, however, it is the plaintiff's reasonable inferences that must be credited." *Bowers*, 2020 WL 7025090, at *5, n.3.

### 2. Complaints Outside the Chain of Command

In previously dismissing this claim, the Court also found that Plaintiffs were not speaking as citizens because their complaints related to their "special knowledge" of the operations of the 911 Call Center that was obtained through their positions as 911 dispatchers. The Court noted that many of the complaints described resulted from their own firsthand observations. Upon review of additional legal authority, however, we reach a different conclusion at this stage.

While it is plausible that Plaintiffs' complaints in the SAC all related to the "special knowledge" of the operations of the 911 Call Center, *Garcetti* cautions this is a non-dispositive factor. 547 U.S. at 421. And the Third Circuit has warned against permitting the government to create "excessively broad job descriptions" for its employees. *Williams v. City of Allentown*, 804 F. App'x 164, 168 (3d Cir. 2020) (quoting *Garcetti*, 547 U.S. at 424). We must therefore

also consider whether Plaintiffs' complaints made to individuals outside their chain of command "fall outside the scope of [their] primary job duties." *Javitz v. County of Luzerne*, 940 F.3d 858, 865 (3d Cir. 2019); *see Jeri*, 625 F. App'x at 581.  And just like Plaintiffs' complaints that were made up the chain of command, the SAC does not contain any allegations that Plaintiffs' statements to first responders or members of the public regarding allegations of discrimination, mismanagement and/or wrongdoing at the 911 Call Center were within their duties as 911 dispatchers and/or supervisors.  Instead, Plaintiffs have alleged they made these statements to these individuals in good faith out of a concern to the community.  Simply put, at this stage Plaintiffs have made plausible allegations they were speaking as citizens when bringing their concerns regarding the 911 Call Center to individuals outside their chain of command hierarchy.

Accordingly, because Plaintiffs have plausibly alleged they were speaking as citizens when making their complaints both within and outside the Plaintiffs' chain of command, Defendants' motion to dismiss Count I is denied.

**b.  Motion to Dismiss Fourteenth Amendment Due Process Claim**

In Count Two of the Second Amended Complaint, Plaintiffs allege Defendants deprived them of their liberty interests in their good names and reputations by spreading defamatory, false and damaging statements regarding their terminations.  Plaintiffs also allege that they had a right to name-clearing hearings which was denied.  In their motion to dismiss, Defendants argue Plaintiffs still cannot point to any false statements made by Defendants.

We previously dismissed this claim because Plaintiffs had failed to plead sufficient factual allegations regarding the publication of stigmatizing statements.  Plaintiffs had failed to identify the substance of the alleged stigmatizing statements, whether Defendants made any of

these statements, or whether they were false.  See ECF No. 33 at 16-17.  Additionally, to the extent that Plaintiffs purported to bring a procedural due process claim, Plaintiffs could not establish they had a property interest in their positions as 911 dispatchers.    In their Second Amended Complaint, Plaintiffs again allege the Defendants spread false and defamatory statements regarding the New Year's toast and the subsequent firings and resignations.  SAC at ¶¶ 218-219.  This time Plaintiffs point to statements made by defendants Molchany and Armstrong about New Year's toast and subsequent terminations and resignations in a January 22, 2020 WFMZ media article titled "10 Lehigh County 911 Center Workers Lose Jobs After Alleged New Year's Eve Drinking Incident."  *Id.* at ¶¶ 216-18; Ex E.  While the article did not identify any of the Plaintiffs by name, it described the events that took place in the 911 Call center on December 31, 2019 and the aftermath.

Defendants argue these statements to the press were not false. Because we are required to accept all factual allegations in the SAC as true, and construing the SAC in the light most favorable to the Plaintiffs, the Court finds it plausibly alleges Defendants Molchany and Armstrong caused defamatory or false statements to be made about the Plaintiffs.  *See Psota v. New Hanover Twp.*, No. CV 20-5004, 2021 WL 6136930, at *15 (E.D. Pa. Dec. 29, 2021). Plaintiffs still fail, however, to provide any specific allegations as to defamatory statements that were made by the other defendants.

Defendants also argue Plaintiffs' stigma-plus claim fails because Plaintiffs do not allege they requested a name-clearing hearing.  In their SAC, Plaintiffs allege Defendants "surreptitiously denied [their] requests for name-clearing hearings by falsely promising that if each Plaintiff simply reapplied for his or her position with Defendant County's 911 Communication enter, his or her application for re-employment would be positively considered

and each would be rehired by Defendant County." SAC at ¶ 228. Nonetheless, the Third

Circuit has not required Plaintiffs to allege they requested a name-clearing hearing to establish a

stigma-plus claim. *See Hill v. Borough of Kutztown*, 455 F.3d 225, 239, n.19 (3d Cir. 2006) ("It

is not clear from the complaint whether [Plaintiff] requested any sort of name-clearing hearing,

but we have not held that he was required to do so"); *see Ersek v. Twp. of Springfield*, 102 F.3d

79, 84, n.8 (3d Cir. 1996); *Carroll v. Lackawanna Cnty.*, No. 3:12-CV-2308, 2014 WL 325322,

at *4 (M.D. Pa. Jan. 29, 2014) ("Given the unsettled nature of this issue within the Third

Circuit, [Plaintiff] will be allowed to proceed on her stigma-plus claim.").

1. Plaintiff's Purported Property Interest in their Positions as 911
   Dispatchers

In their SAC, Plaintiffs aver they possessed a property interest in their continued

employment as 911 dispatchers and purport to allege this property interest was violated. In their

motion to dismiss, Defendants argue Plaintiffs due process claim fails as a matter of law,

specifically addressing the stigma plus claim. Plaintiffs' response addressed both the property

interest and the stigma-plus claim.

"To have a property interest in a job … a person must have more than a unilateral

expectation of continued employment; rather, she must have a legitimate entitlement to such

continued employment." *Elmore v. Cleary*, 399 F.3d 279, 282 (3d Cir. 2005) (citing *Bd. of

Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)). As a general rule, at-will employees

do not have such an entitlement because they serve at the pleasure of their employers. *Id.*

(citing *Chabal v. Reagan*, 841 F.2d 1216, 1223 (3d Cir.1988)). "Whether a person has a

legitimate entitlement to—and hence a property interest in—his government job is a question

answered by state law." *Hill*, 455 F.3d at 234 (internal citations omitted). In Pennsylvania,

public employees are considered at-will unless otherwise indicated by statute or contract.

*Astine v. Adams*, No. 20-CV-02160, 2023 WL 1805204, at *3 (M.D. Pa. Feb. 7, 2023).  In their

SAC and motion response, Plaintiffs claim their property interest in their positions is derived

from the Pennsylvania Whistleblower Law, *see* 43 P.S. § 1423(a), and Title VII of the Civil

Rights Act.  *See* 42 U.S.C. § 2000e-2(a)(1).   But the Pennsylvania Whistleblower Law does not

confer a property right to continued employment.  *Conrad v. Northumberland Cnty.*, No. 4:09-

CV-01326, 2010 WL 454960, at *6 (M.D. Pa. Feb. 3, 2010) ("Although the Whistle Blower

Law affords those covered by it a remedy for wrongful discharge, it does not create a

constitutionally protected property interest in the job.").  Nor does Title VII, as federal statute,

confer any property interest in their positions.  Accordingly, at this time, Plaintiffs again have

failed to establish they had a "legitimate entitlement to [their] continued employment" as 911

dispatchers.  *See Elmore*, 399 F.3d at 282.

In sum, Plaintiffs' SAC plausibly alleges a stigma-plus claim as to defendants Molchany

and Armstrong.  Therefore Defendants' motion to dismiss Count II is denied as to those

defendants.  Defendants' motion is granted as to the other defendants.

### c.   Motion to Dismiss Hostile Work Environment Claims

Defendants move to dismiss Plaintiff Palmer's hostile work environment claim under Title

VII.  "A hostile work environment claim under Title VII requires a showing of the following

elements by the plaintiff: (1) the employee suffered intentional discrimination because of

membership in a protected class; (2) the discrimination was severe or pervasive; (3) the

discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally

affect a reasonable person in like circumstances; and (5) the existence of responsibility on the part

of the employer." *Felder v. Penn Mfg. Indus.*, 303 F.R.D. 241, 243 (E.D. Pa. 2014) (citing *Mandel*

*v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013)).  "The first four elements establish

a hostile work environment, and the fifth element determines employer liability." *Id.* (quoting *Mandel*, 706 F.3d at 167).

Plaintiffs' SAC satisfies the first element.   Plaintiff Palmer has presented factual allegations she suffered intentional discrimination because of her membership in a protected class. These allegations include inappropriate comments from male co-workers as well as female supervisor Buskaritz regarding Palmer's breaks she took to pump breastmilk at work.   SAC at ¶ 66(a-b).   Palmer has also made several allegations regarding co-worker Rabenold, whom she accused of making inappropriate comments, inappropriately touching her without permission, and printing a photograph of her and placing it on the cover of his work binder.   *Id.* at ¶ 66(c).   Palmer also alleged she was harassed by Harvey-Borso, who told Palmer the only reason she was hired was because of her brother and because she is a woman, and Smith, who told Palmer that women are not capable of doing the job as well as men, and played a recording of Palmer making a botched weather announcement for others.   *Id.* at ¶ 66(f).   Palmer has alleged she suffered these intentional acts as a result of her gender.

As to the second element, Defendants argue the allegations were not severe or pervasive. To determine whether alleged harassment was severe or pervasive, we must consider a variety of factors, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993); *see Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 205 (3d Cir. 2001).   The alleged conduct must "go beyond 'simple teasing, offhand comments, and [non-serious] isolated incidents,' which would 'not amount to discriminatory changes in the terms and conditions of employment.'" *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 280 (3d Cir.2001)

(quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1988)).   And allegations of harassment are not to be treated in isolation – rather, "a court must evaluate the sum total of abuse over time." *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 155 (3d Cir. 1999).

Here, Palmer has plead sufficient factual allegations to satisfy this element at this stage. Palmer has alleged the harassment, in its entirety, took place between 2012-2019.  *See Bates v. Montgomery Cnty.*, No. CV 20-2956, 2021 WL 4243432, at *3 (E.D. Pa. Sept. 17, 2021) ("[T]he discrimination was pervasive because [it] spanned multiple years and included at least six individuals...").   Specifically, the inappropriate comments regarding her breast pumping took place on a weekly basis between 2015-2018, the actions of Rabenold took place on a weekly basis between 2012 through 2019, and the actions of Harvey-Borso and Smith took place on a weekly basis during the first four months of Palmer's employment, and then on a monthly basis during her first year on the job.   SAC at ¶¶ 66, 73-74, 76.   Palmer alleges she suffered embarrassment and humiliation due to the harassment.   She also alleges the harassment interfered with her work performance in that it caused her to isolate herself from other co-workers to avoid the harassment, it delayed her response time to emergency calls out of fear of being unfairly harassed or humiliated by co-workers and supervisors, and, she was made to feel marginalized and contemplated quitting.  *Id.* at ¶ 77.

As to the third and fourth elements, Defendants argue the harassment did not detrimentally affect Palmer, nor would a reasonable person be detrimentally affected by the alleged harassment. To establish the third element, a plaintiff "must only establish that she subjectively perceived her work environment to be hostile or abusive, and not that she suffered 'concrete psychological harm.'" *Grazioli v. Genuine Parts Co.*, 409 F. Supp. 2d 569, 578 (D.N.J. 2005) (quoting *Harris*, 510 U.S. at 22).   This subjective component is a "relatively low hurdle to clear."  *Id.*; *see*

*Colavecchia v. S. Side Area Sch. Dist.*, No. 2:22-CV-01804-CCW, 2023 WL 3043777, at *3 (W.D. Pa. Apr. 21, 2023).  Based on the factual allegations described above, Palmer has plead sufficient factual allegations to satisfy this element.  And given the nature and context of Palmer's allegations, it is plausible a reasonable person would have been similarly affected.

As to the final element, Defendant argues Palmer fails to plead sufficient facts to establish respondeat superior liability.  An employer "may be liable for either a supervisor's or a co-worker's discriminatory acts." *In re Tribune Media Co.*, 902 F.3d 384, 399 (3d Cir. 2018).  To be liable for a co-worker's actions, the employer must have either failed to provide a reasonable avenue for complaint or the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action.  *Id.* at 400.

The allegations in the SAC satisfy this final element.  Palmer has alleged she suffered harassment from both co-workers and supervisors.  The allegations described above involved co-workers Ruhe, Rabenold, Harvey-Borso and Smith, as well as supervisors Gieringer, Connie Smith, and Kelly McDonald.  SAC at ¶ 66.  When Palmer complained repeatedly to supervisor Gieringer about Rabenold's offensive behavior, she was instructed by Gieringer and other supervisors to accept and tolerate the behavior.  *Id.* at ¶ 66(d).  Palmer also complained to supervisors Dan Bellesfield and Defendant Bailey about the comments of Harvey-Borso and Smith and asked to be re-assigned.  *Id.* at ¶ 66(f).  This request was denied.  In sum, based upon these factual allegations Palmer has plead sufficient factual allegations to state a Title VII Hostile Work Environment claim against Gieringer and Bailey.  Accordingly, Defendants' motion to dismiss Count III is denied as to defendants Gieringer and Bailey, and granted as to the other defendants.

### d.  Motion to Dismiss *Monell* Claim

Plaintiffs' *Monell* claim was previously dismissed because they had failed to establish any underlying constitutional violation, and, because it failed to allege a policy or custom that led to any injuries, or that any "failure or inadequacy amount[ed] to deliberate indifference on the part of [defendant Lehigh County]." *See Forrest v. Parry*, 930 F.3d 93, 106 (3d Cir. 2019).  Plaintiffs have again brought a *Monell* claim, which purports to allege the violation of Plaintiffs' First Amendment rights was due to defendant Lehigh County's policy, practice, or custom, as well as a failure to train or supervise its supervisory or management employees.

At the outset, Defendants argue Plaintiffs' cannot establish a *Monell* claim because they have not sufficiently alleged an underlying constitutional violation.  This argument fails, as Plaintiffs' First Amendment Retaliation claim is going to survive the motion to dismiss. Defendants also argue Plaintiffs have failed to identify a pattern of similar incidents or any specific training or policies that could reasonably have prevented the alleged First Amendment violation, or that demonstrate Lehigh County acted with "deliberate indifference."

There are two ways to proceed with a § 1983 claim against a municipality.  *See Forrest*, 930 F.3d at 105.  First, "[a] plaintiff may put forth that an unconstitutional policy or custom of the municipality led to his or her injuries." *Id.* (citing *Estate of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019)).  Alternatively, a plaintiff may allege that his or her injuries "were caused by a failure or inadequacy by the municipality that reflects a deliberate or conscious choice." *Id.* (internal quotation marks and citation omitted).

A plaintiff alleging an unconstitutional policy must "point to an official proclamation, policy or edict by a decisionmaker possessing final authority to establish municipal policy on the relevant subject." *Id.*  To show an unconstitutional custom, a plaintiff "must evince a course of

conduct so well-settled and permanent as to virtually constitute law." *Id.* at 106 (internal citation omitted).

By contrast, a plaintiff bringing a "failure or inadequacy" claim must demonstrate that the "failure or inadequacy amount[ed] to deliberate indifference on the part of the municipality." *Id.* (internal citation omitted).  Deliberate indifference is found where "(1) municipal policymakers know that employees will confront a particular situation, (2) the situation involves a difficult choice or a history of employees mishandling, and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Id.* (citing *Carter v. City of Phila.*, 181 F.3d 339, 357 (3d Cir. 1999)).  "'[A] pattern of similar constitutional violations by untrained employees" is ordinarily necessary to demonstrate deliberate indifference, but a single incident may, in certain situations, be sufficient. *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 223 (3d Cir. 2014) (internal quotation marks and citation omitted).  In these "single-incident cases," the "need for training can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." *Id.* (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 n.10 (1989)).

Similar to their Amended Complaint, Plaintiffs' SAC fails to allege a policy or custom that led to a violation of Plaintiffs' First Amendment rights.  At several points Plaintiff mentions defendant Lehigh's "official policies and customs of stifling Plaintiffs' Constitutional rights under the 1st and 14th Amendment to citizen speech…", but these legal conclusions fail to adequately state a *Monell* claim.  Indeed, Plaintiffs have not pointed to any specific municipal policy or custom that led to a violation of their First Amendment rights.  "Conclusory and general claims that paraphrase [section] 1983 will not satisfy federal pleading requirements," yet that is all Plaintiffs allege in their second amended pleading.  *McCall v. City of Philadelphia*, 396 F. Supp.

3d 549, 559 (E.D. Pa. 2019) (citing *Wood v. Williams*, 568 F. App'x 100, 104 (3d Cir. 2014)); *see also Washington v. City of Phila.*, No. 11-CV-3275, 2012 WL 85480, at *8 (E.D. Pa. Jan. 11, 2012) (dismissing section 1983 claim where plaintiff's "description of the policy or custom falls far short of a 'specif[ication of] what exactly that custom or policy was,' as our Court of Appeals requires" (quoting *McTernan v. City of York, Pa.*, 564 F.3d 636, 658 (3d Cir. 2009)).

Plaintiffs' attempt at pleading a "failure or inadequacy" claim also falls short, as they have failed to present sufficient factual allegations to show any municipal policymakers knew that employees would confront a particular situation, the situation involved a difficult choice or a history of employees mishandling, and the wrong choice by an employee would frequently cause deprivation of constitutional rights, in this case a First Amendment violation. *See Forrest v. Parry*, 930 F.3d at 106. Nor have Plaintiffs presented factual allegations to show "a pattern of similar constitutional violations by untrained employees." *Thomas*, 749 F.3d at 223. And because Plaintiffs "alleg[e] no facts for the Court to infer that [their] injury was a 'highly predictable consequence of the municipality's failure to train and supervise its [employees],'" they have not stated a cognizable "single-incident claim" either. *Ferrara v. Del. Cnty.*, No. 18-cv-05157, 2019 WL 2568117, at *8 (E.D. Pa. June 21, 2019) (quoting *Thomas*, 749 F.3d at 225).

### e. Motion to Dismiss Civil Conspiracy Claim

Plaintiffs again allege a § 1983 Conspiracy claim against defendants Redding, Molchany, Kalynych, Bailey and Gieringer. "In order to state a claim for conspiracy under section 1983, a plaintiff must establish (1) the existence of a conspiracy involving state action; and (2) a deprivation of civil rights in furtherance of the conspiracy by a party to the conspiracy." *Rosembert v. Borough of E. Lansdowne*, 14 F. Supp.3d 631, 647 (E.D. Pa. 2014) (internal quotation marks and citation omitted); *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 293–94 (3d

Cir. 2018) ("To prevail on a conspiracy claim under § 1983, a plaintiff must prove that persons acting under color of state law 'reached an understanding' to deprive him of his constitutional rights." (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970)).  To that end, Plaintiffs must allege plausible facts concerning "(1) the period of the conspiracy; (2) the object of the conspiracy; and (3) certain actions of the alleged conspirators taken to achieve that purpose." *Hankin Fam. P'ship v. Upper Merion Twp.*, No. 01-CV-1622, 2012 WL 43599, at *17 (E.D. Pa. Jan. 6, 2012) (internal quotation marks and citation omitted); *see also Rosembert*, 14 F. Supp. 3d at 648 ("To withstand a motion to dismiss, a complaint alleging a civil rights conspiracy should identify with particularity the conduct violating plaintiffs' rights, the time and place of these actions, and the people responsible therefor." (internal quotation marks and citation omitted)).  A party alleging a civil conspiracy may rely on both direct and circumstantial evidence to establish said agreement.  *Ball v Paramount Pictures*, 169 F.2d 317, 319-20 (3d Cir. 1948) ("conspiracy may be inferred when the concert of action could not possible be sheer coincidence").

We previously dismissed Plaintiffs' civil conspiracy claim because they had failed to establish an underlying Constitutional violation in their Amended Complaint.  Plaintiffs had also failed to plead any specific allegations as to the actions taken in furtherance of the conspiracy by the named Defendants.

As an initial matter, Plaintiffs' First Amendment Retaliation claim is going to survive the motion to dismiss.  Therefore, at this stage Plaintiffs have sufficiently plead they suffered a deprivation of rights.  *See Rosembert*, 14 F. Supp.3d at 647.  Plaintiffs have also made additional factual allegations to support their civil conspiracy claim, which include the following: that defendant Bailey called Plaintiff Kirchner into her office on two occasions to ask him about complaints made about Alvarez-Carril by Caucasian dispatchers, SAC at ¶ 266; the investigation

into the 2019 New Year's toast began after an "anonymous" phone call was made following the January 12, 2020 Morning Call article, *id.* at ¶ 279; after Plaintiffs lost their positions defendant Gieringer proudly acknowledged that she was the person who made the call, *id.* at ¶ 280; that Gieringer had placed call/s to Armstrong, Hozza, Molchany, Redding, Kalynych and/or Bailey, *id.*; and the decision to terminate Plaintiffs' employment or force them to resign was made in concert by defendants Armstrong, Hozza, Molchany, and Redding. *Id.* at ¶ 283.  Construing the SAC in the light most favorable to the Plaintiffs, the factual allegations made in the SAC are sufficient to raise an inference defendants Redding, Molchany, Kalynych, Bailey and Gieringer engaged in a conspiracy to deprive Plaintiffs of their First Amendment rights.  Therefore Defendants' motion to dismiss Count V of the complaint is denied.

### f.   Motion to Dismiss Supervisory Liability Claims

Plaintiffs have brought separate supervisory liability claims against Armstrong and Hozza, Jr.  (Counts VI-VII) pursuant to § 1983.  As noted above, § 1983 is not a source of substantive rights.  However, the factual allegations regarding Plaintiffs' supervisory liability claims all stem from Plaintiffs' First Amendment Retaliation Claim.

The Third Circuit recognizes two theories of supervisory liability.  *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juv. Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004).  Under the first theory, "individual defendants who are policymakers may be liable under § 1983 if it is shown that such defendants, 'with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm.'" *Id.* (quoting *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 725 (3d Cir.1989)).  Here, the plaintiff "must identify the supervisor's specific acts or omissions demonstrating the supervisor's deliberate indifference to the [plaintiff's] risk of injury and must establish a link between the supervisor, the act, and the

injury." *Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 227 (3d Cir. 2015).   As to the second

theory, "a supervisor may be personally liable under § 1983 if he or she participated in violating

the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge

of and acquiesced in the subordinate's unconstitutional conduct." *Barkes v. First Corr. Med.*,

Inc., 766 F.3d 307, 316 (3d Cir. 2014), *reversed on other grounds by Taylor v. Barkes*, 575 U.S.

822 (2015) (citation omitted); *see Santiago v. Warminster Township*, 629 F.3d 121, 130 (3d Cir.

2010) ("[A]ny claim that supervisors directed others to violate constitutional rights necessarily

includes as an element an actual violation at the hands of subordinates.").

Plaintiffs' claims in the SAC survive under the second theory.   First, Plaintiffs have

sufficiently pleaded a First Amendment Retaliation claim.   As to the factual allegations, Plaintiffs

claim that Armstrong and Hozza, Jr. had knowledge of the complaints that were being raised by

Plaintiffs through contact with the other defendants, who reported directly to Armstrong and

Hozza, Jr., through the Guardian Tracker database, and by the disclosures of Gatens, Kirchner,

and Alvarez-Carril at the Townhall meetings held on August 25, 2019 and December 10, 2019.

Plaintiffs allege Armstrong and Hozza, Jr., along with Molchany and Redding, agreed to

terminate the positions of supervisors David C. Gatens and Kirchner, and to force the resignations

of the other Plaintiffs.   These factual allegations are enough at this stage to survive a motion to

dismiss.

### g.   Motion to Dismiss Intentional Infliction of Emotional Distress Claim

A district court "shall have supplemental jurisdiction over all other claims that are so

related to claims in the action within [the court's] original jurisdiction that they form part of the

same case or controversy under Article III ...." 28 U.S.C. § 1367(a).   Here, Plaintiffs state law

claim of Intentional Infliction of Emotional Distress arises from the same factual case that forms

the basis for our original jurisdiction.  Therefore the Court exercises supplemental jurisdiction over this remaining claim.  Defendants' motion to dismiss Count VIII is denied.

### h.  Motion to Strike

Lastly, Defendants move this Court to strike numerous paragraphs of the Complaint pursuant to Federal Rule of Civil Procedure 12(f), arguing "[the paragraphs] are immaterial, impertinent, and scandalous, as they relate to events that occurred seven (7) months after Plaintiffs' employment with the County ended."  ECF No. 39 at 24.

Pursuant to Federal Rule of Civil Procedure 12(f), "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  "The standard for striking under Rule 12(f) is strict and…only allegations that are so unrelated to plaintiffs' claims as to be unworthy of any consideration should be stricken."  *Johnson v. Anhorn*, 334 F. Supp. 2d 802, 809 (E.D. Pa. 2004) (quoting *Becker v. Chi. Title Ins. Co*., No. Civ. A. 03-2292, 2004 WL 228672, at *18 (E.D.Pa. Feb. 4, 2004)).  Indeed, "[s]triking a pleading or a portion of a pleading 'is a drastic remedy to be resorted to only when required for the purposes of justice."  *Lee v. Dubose Nat'l Energy Servs., Inc.*, No. 18-cv-2504, 2019 WL 1897164 at *4 (E.D. Pa. Apr. 29, 2019)).  However, courts have "considerable discretion" in ruling on a Rule 12(f) motion to strike.  *Deltondo v. Sch. Dist. of Pittsburgh*, No. CV 2:22-350, 2023 WL 1108389, at *2 (W.D. Pa. Jan. 30, 2023).

Defendants move to strike paragraphs 169-181 of the SAC, which refer to a fire that took place on July 27, 2020 at a home in Allentown.  Two individuals were killed in the fire.  SAC at ¶ 181.  In their SAC Plaintiffs allege that during the fire the 911 Call Center failed to properly handle calls received from one of the individuals who ultimately died in the fire and several neighbors, all of whom were Spanish speaking.  *Id.* at ¶ 178.  Plaintiffs aver the dispatcher on

duty was one of the individuals who they alleged discriminated against Spanish speaking members of the community. *Id.* at ¶176. Plaintiffs state that due to the Defendants' failure to train and supervise their 911 dispatchers, and their refusal to heed the warnings made by Plaintiffs in their complaints, calls made during the fire were cut off or prematurely terminated. *Id.* at ¶ 179. In their response to Defendants' motion, Plaintiffs claim these paragraphs are relevant to Plaintiffs' claims of citizen speech and whether it constituted matters of public concern.

While these paragraphs concern an incident that took place seven months after Plaintiffs' terminations and resignations, these paragraphs are arguably relevant to Plaintiffs' First Amendment Retaliation claim. The Court finds the concern of striking potentially relevant allegations, at this early stage, outweighs any concerns of prejudice. *See Levy v. Jaguar Land Rover North Am., LLC*, No. 19-13497, 2020 U.S. Dist. LEXIS 18711 at *5 (D. N.J. Feb. 4, 2020) ("To succeed on a motion to strike, the moving party must show that the allegations in the complaint '*have no possible relation to the controversy* and may cause prejudice to one of the parties, or that the allegations confuse the issues.'") (quoting *Garlanger v. Verbeke*, 223 F. Supp. 596, 609 (D. N.J. 2009)) (emphasis added). Therefore, out of an abundance of caution to avoid striking allegations arguably relevant to Plaintiffs' claims, and considering the "highly disfavored" nature of a motion to strike, the Court will deny Defendants' motion. *See Eisai Co. v. Teva Pharms. USA, Inc.*, 629 F. Supp.2d 416, 424 (D. N.J. 2009) ("Motions to strike are highly disfavored.").

**IV.    CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss is **GRANTED in part and DENIED in part**.  Defendants' motion to strike is **DENIED**.  An appropriate order follows.


BY THE COURT:



*/s/ John M. Gallagher*
JOHN M. GALLAGHER
United States District Court Judge